[No. 22610-3-II.   Division Two.   January 29, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. THORSTEN MARTIN JERDE, *Appellant*.

*Patricia A. Pethick*, for appellant (appointed counsel for appeal).

*John W. Ladenburg, Prosecuting Attorney*, and *Barbara L. Corey-Boulet, Deputy*, for respondent.

BRIDGEWATER, C.J. — Thorsten M. Jerde appeals his exceptional sentence of 497 months' incarceration after his guilty plea to second degree murder. We hold that by emphasizing aggravating factors in the murder at sentencing, without prompting by the sentencing court, the prosecutor breached the plea agreement and undercut the sentencing recommendation of 346 months. We reverse and remand for Jerde to make an election, before a different judge, as to whether he desires withdrawal of his plea of guilty or specific performance of the agreement.

In December 1996, Scott Claycamp, a 29-year-old caregiver for the disabled, was murdered while at work in a

private residence[1] in Lakewood. Intruders entered the house under the pretext of asking for directions and one intruder, while brandishing a gun, ordered Claycamp to lie on the ground. Even though Claycamp complied with the order and offered no resistance, the intruder shot Claycamp in the back of his head, killing him. Claycamp's client and friend of five years, Dennis Robertson, witnessed the murder from his bed in the room. The intruders stole a lockbox from a back room and a bag of valuables attached to one of the wheelchairs.

Jerde was one of the intruders. He was let into the house through the back door after Gordon Crockett, the shooter, gained entry through the front. Jerde supplied the .357 caliber revolver to Crockett, and Jerde stole the lockbox from the house. Five persons in all, including Jerde, were arrested and charged with Claycamp's murder. All five entered into plea bargains with the State.

The police discovered that codefendant Roberta Elmore hatched the scheme to burglarize the house, motivated partially by spite. A few weeks before Claycamp's murder, Elmore had been working for an "escort service" when one of Claycamp's clients sought to hire Elmore for "sexual services." Upon arriving at the house, Elmore declined to perform, but unsuccessfully argued that she was entitled to the money anyway. A short time later, Elmore enlisted the help of the other defendants to burglarize the home. Crockett and two others, who decided not to participate in the crime, staked out the house the night before the murder and discussed the planned burglary. Jerde was not present at the stakeout. But Jerde admitted to driving by the residence once with Elmore and Crockett and discussing the burglary weeks before the murder.

The State offered Jerde a plea bargain: If Jerde pleaded guilty to second degree murder, the State would dismiss the remaining charges in the first amended complaint and

---

[1]Dennis Robertson, one of Claycamp's clients, owned the home. Robertson has cerebral palsy. Two other disabled men lived in the home with Robertson and received care from several other caregivers.

recommend 346 months' incarceration, a midrange sentence for an offender with Jerde's criminal history. Jerde agreed to the offer. The trial court accepted Jerde's guilty plea and set a hearing to sentence all five defendants. A presentence investigator filed a report recommending that Jerde serve an exceptional sentence of 688 months' incarceration. Jerde filed a written objection to the presentence report, in which he requested an evidentiary hearing for certain factual claims in the report and disputed both the factual and legal bases for the recommended exceptional sentence.

At the sentencing hearing, the court heard victim impact statements from several people, including Greg Claycamp, the decedent's brother, and Dennis Robertson, who had witnessed the murder. At the conclusion of the statements, one of two prosecutors addressed the court and proceeded to outline the legal and factual grounds upon which the court could rely in imposing an exceptional sentence.[2]

At Jerde's individual sentencing, a second prosecutor addressed the court. While the second prosecutor announced

---

[2] "[Co-prosecutor]: . . . Before we proceed to sentence the individual defendants, the State has some comments that will—we wish to make. . . . There are factors that are applicable to all of the cases that have been used as factors for exceptional sentences in other cases. The State is not deviating from its plea bargaining in asking the Court and continues to ask the Court to impose the sentences that will be recommended in each of the cases. But I cite these factors and this law to the Court because we believe that it speaks loudly for standard range sentences, for high-end sentences in these cases. This case involved, we believe—

"[Attorney for codefendant Crockett]: Your Honor, I'm going to object to this. The State has made a recommendation, in my particular defendant's case, for a mid-range recommendation of 292 months, and I don't believe that at this point they can now argue—

"[Co-prosecutor]: I don't wish to change the individual recommendation.

"[Attorney for codefendant Crockett]: —argue for high-end recommendation.

"[Co-prosecutor]: I want to talk about the factors that justify the State's particular recommendation in each case. We'll be making the recommendations in the plea.

"[Attorney for codefendant Crockett]: I'm sorry; I misunderstood [co-prosecutor].

"THE COURT: These are general statements. I think apply across the board.

"[Attorney for codefendant Crockett]: I understand. I heard her to say she thought these argued for high-end recommendations which is contrary to their prior promises made pursuant to the plea agreements. If she's just stating general factors, I have no objection.

the State's agreed recommendation for 346 months' incarceration, she reemphasized the aggravating circumstances that justified imposition of an exceptional sentence.[3]

---

"[Co-prosecutor]: That's correct. The State is well aware of its plea obligation. If I misspoke, I apologize to the counsel. This case did involve a high degree of sophistication and planning. The Court, provided a video tape depositions of Michael Coons and Dale Allen, is well aware that the home of Dennis Robertson was staked out days in advance of this crime. Pictures of the residence were admitted in those video depositions. And the Court, I'm sure, recalls vividly the description of said residence.

"It is a single story residence. It has a ramp for the wheelchair-bound occupants who reside therein. And at one point when the individuals were observing the home, a paratransit bus specifically equipped for individuals with these disabilities did pull up.

"Roberta Elmore had been in the residence. She knew the limitations and disabilities of the occupants. And this residence, with its particularly vulnerable victims, was targeted by these defendants.

"In addition to that, the murder was committed in the presence of an eyewitness. The law is extremely clear in this jurisdiction that the Court can consider the fact witnesses are present and will be traumatized by a crime in imposing sentence.

"In *State v. Crutchfield*, at 53 Wn. App. 916, the court held that: "[t]he impact of a defendant's activities on a person other than the victim is a relevant factor for sentencing if it is foreseeable that the defendant's acts would affect these other people." Obviously, accomplices share the mental state of the principal, that he share his knowledge. Gordon Crockett went into the bedroom where Dennis Robertson was laying on the bed and chose to execute Scott Claycamp in the presence of this witness. It will be reasonably foreseeable, we submit, beyond argument that this type of traumatic event would leave a very lasting and harmful impression on any witness.

"In addition to that, the crime is aggravated because it invaded his own privacy. The cases are clear in Washington that when crimes occur in homes that that's a proper factor for the court to consider. And certainly there is, you know, nothing more sacred than one's individual residence. And these crimes invaded— they were home invasion. They invaded the residence of Dennis Robertson.

"We want to turn first, then, to the sentencing for [one of the defendants]. [Whereupon, Defendant Wilms' and Defendant Edwards' sentencing was conducted and is not included in the transcript on appeal.]"

[3]"[Co-prosecutor]: Would the Court like to hear the State's recommendation?

"THE COURT: Yes, please.

"[Co-prosecutor]: The State is recommending that the Court sentence Mr. Jerde to 346 months Department of Corrections; $500 crime victim penalty assessment, 110 court costs, 100 crime lab fee; Restitution which has—my understanding—been agreed to by the defense; Two years community placement; DNA.

"The State has had an opportunity to review the presentence investigator's report with regards to the factors that they wish this Court to look at in sentencing Mr. Jerde. I had some comments with regards to that. I don't know if the Court wants to hear it at this time.

Jerde's attorney objected to the prosecutor's comments, challenged the asserted bases for imposing an exceptional sentence, and renewed the request for an evidentiary hearing. The court heard a statement by Jerde, then imposed an exceptional sentence of incarceration for 497 months, and set a hearing for entry of findings of fact and conclusions of law.

At this final hearing, the trial court adopted four factors as supporting Jerde's exceptional sentence:

1) the crime involved a high degree of sophistication and planning;

2) the crime was an invasion of the zone of privacy of the victims, because it was committed in their home;

3) Jerde knew the particular vulnerability of the occupants;

4) Jerde reasonably should have foreseen that the crime

---

"THE COURT: Yes, I would, please.

"[Co-prosecutor]: Your Honor, the State would agree with [Jerde's attorney] in some of the statements that she made in the brief submitted, that some of the factors that the presentence report writer has indicated the Court can consider for a sentence is incorrect. The statement with regards to deliberate cruelty to the victim. Based on the case law in the State of Washington, that would be an incorrect factor for the Court to consider. However, the State would remind the Court, as previously stated by [co-prosecutor], that there are a number of factors that the Court can consider in sentencing Mr. Jerde, and the State would like the Court to consider these factors:

"In addition to the fact that he—or this crime was committed in the presence of the eye witness, Mr. Robertson, and the traumatic event that he has experienced and has continued to experience;

"The fact that this crime was committed in the home of Mr. Robertson. It clearly invaded the zone of privacy.

"The State would also contend that this crime occurred over a period of time, planning.

"There is also indication in the presentence report that Mr. Jerde lacks remorse, and that's certainly a factor that the Court can consider in imposing sentence. Thank you.

"THE COURT: Just for my edification, the prosecutor's recommendation is 346 months?

"[Co-prosecutor]: That's correct, Your Honor.

"THE COURT: Is that—is that the—in the middle of the standard range, then? The standard range, as I am advised in the presentence report, is 298 to 397.

"[Co-prosecutor]: That's correct, Your Honor.

"THE COURT: Okay. Okay. I just wanted to understand."

.

would have an extraordinary impact on the particularly vulnerable victims.

■■■ The State enters into a contract with a defendant when it offers a plea bargain and the defendant accepts. *See, e.g., State v. Talley,* 134 Wn.2d 176, 949 P.2d 358 (1998); *State v. Sledge,* 133 Wn.2d 828, 947 P.2d 1199 (1997); *State v. Coppin,* 57 Wn. App. 866, 791 P.2d 228, *review denied,* 115 Wn.2d 1011 (1990). Because a defendant gives up important constitutional rights by agreeing to a plea bargain, the State must adhere to its terms by recommending the agreed upon sentence. *Talley,* 134 Wn.2d at 183; *In re Palodichuk,* 22 Wn. App. 107, 109-10, 589 P.2d 269 (1978).

> Although the recommendation need not be made enthusiastically, the prosecutor is obliged to act in good faith, participate in the sentencing proceedings, answer the court's questions candidly in accordance with [the duty of candor toward the tribunal] and, consistent with RCW 9.94A.460, not hold back relevant information regarding the plea agreement.

*Talley,* 134 Wn.2d at 183. At the same time, the State is obligated not to undercut the plea bargain "explicitly or by conduct evidencing an intent to circumvent the terms of the plea agreement." *Sledge,* 133 Wn.2d at 840 (citing inter alia, *Palodichuk,* 22 Wn. App. 107). As we have said in *Palodichuk,* 22 Wn. App. at 109-11, and the Supreme Court emphasized in *Talley,* 134 Wn.2d at 183-84, prosecutorial conduct is very important to the integrity of the plea bargaining process, and a prosecutor must adhere to the terms of the plea agreement and avoid tainting the sentencing process. The test is whether the prosecutor contradicts, by word or conduct, the State's recommendation for a standard range sentence. *Talley,* 134 Wn.2d at 187.

An appellate court applies an objective standard to determine whether the State has breached a plea agreement " 'irrespective of prosecutorial motivations or justifications for the failure in performance.' " *Palodichuk,* 22 Wn. App. at 110 (quoting *United States v. Brown,* 500 F.2d 375, 378 (4th Cir. 1974)).

In *Talley*, the court determined that the State could participate in a "real facts" evidentiary hearing to determine whether an exceptional sentence was justified without necessarily undercutting its plea agreement. But the court acknowledged that during such an evidentiary hearing, a prosecutor "could easily undercut the plea agreement by placing emphasis on the evidence that supports findings that aggravating factors are present." *Talley*, 134 Wn.2d at 186.

In *Sledge*, the Supreme Court concluded that a prosecutor had undercut the State's plea agreement by: calling a probation counselor to testify about the "manifest injustice report"; questioning the counselor extensively about the factors that caused her to recommend an exceptional sentence; calling the juvenile's parole officer; and presenting a lengthy summary of the aggravating factors. 133 Wn.2d at 842-43.

In *Coppin*, we held that a prosecutor had not breached the plea agreement by submitting an unfavorable probation report and honestly responding to the trial court's question about whether the record would support an exceptional sentence. 57 Wn. App. at 875. The prosecutor had recommended a sentence at the high end of the standard range and briefly explained why the State was interested in reaching a plea bargain. *Id.* at 868-69. In response to the court's inquiry, the prosecutor stated that he would have sought an exceptional sentence were he not bound by the agreement. *Id.* at 869.

In *Palodichuk*, the State initially fulfilled its plea obligation by making the agreed recommendation to the sentencing judge. But we concluded that by expressing reservations about the State's recommendation, the prosecutor had breached and undercut the plea bargain. *Palodichuk*, 22 Wn. App. at 110-11.

*Coppin* is not analogous. There, the trial judge invited the prosecutor to comment on whether an exceptional sentence was warranted, and the prosecutor responded

with candor. But the prosecutor in *Coppin* acted in good faith by explaining how the plea bargain inured to the State's benefit and the prosecutor was, on balance, more faithful to the plea agreement. 57 Wn. App. at 868-70. In addition, the State in *Coppin* recommended a high-end sentence and the prosecutor's comments were consistent with explaining why a high-end sentence was justified. *Id.* at 868-69.

Similarities appear between *Sledge* and this case: (1) both prosecutors unnecessarily commented on a written presentence report that was already before the court; (2) the prosecutors underscored aggravating factors; and (3) the prosecutors maintained that the State was adhering to its plea agreement but clearly behaved otherwise. The court in *Sledge* found the actions of the prosecutor to be a transparent attempt to sustain an exceptional sentence.

An objective review of the entire sentencing record suggests that the two prosecutors effectively undercut the plea agreement in a transparent attempt to sustain an exceptional sentence. While the prosecutors maintained that they were adhering to the recommended midrange sentence, both prosecutors advocated for an exceptional sentence by highlighting aggravating factors and even added an aggravating factor not found in the presentence report. Without prompting from the court, the first prosecutor laid the foundation by articulating several factual and legal arguments that would support an exceptional sentence. To do so was completely unnecessary in light of the State's midrange recommendation. When it came to Jerde's individual sentencing, the second prosecutor picked up where the first left off by reemphasizing the aggravating circumstances. While the court responded affirmatively when the second prosecutor asked whether it wanted to hear the prosecutor's comments regarding the presentence report, the court's assent does not absolve either prosecutor's comments.

■ When the prosecutor breaches a plea agreement, the appropriate remedy is to remand for the defendant to

choose whether to withdraw the guilty plea or specifically enforce the State's agreement. "[T]he defendant's choice of remedy controls, unless there are compelling reasons not to allow that remedy." *State v. Miller*, 110 Wn.2d 528, 535, 756 P.2d 122 (1988).

Because of our disposition we need not address other issues raised by Jerde.

Reversed and remanded for Jerde to elect either to withdraw his plea of guilty or to enforce the plea bargaining agreement before a different judge.

HOUGHTON and HUNT, JJ., concur.

Review denied at 138 Wn.2d 1002 (1999).