[No. 27144-3-II. Division Two. July 19, 2002.]

THE STATE OF WASHINGTON, *Respondent*, v. TINA LOUISE VAN BUREN, *Appellant*.

*Stephanie C. Cunningham*, for appellant (appointed counsel for appeal).

*Gerald A. Horne, Prosecuting Attorney*, and *John C. Hillman, Deputy*, for respondent.

SEINFELD, J. — Tina Louise Van Buren appeals her 600-month exceptional sentence for the first degree murder of her former roommate. She argues that the prosecutor violated the plea agreement by participating in a court-ordered evidentiary hearing and by proposing findings of fact and conclusions of law that included aggravating factors the court did not address in its oral ruling. She also asserts that (1) the sentencing court violated the real facts doctrine, (2) the evidence does not support the court's findings of fact, (3) the facts do not justify the exceptional sentence, and (4) the sentence is clearly excessive. Finding no error, we affirm.

FACTS

In June 1998, the State charged Van Buren with first degree murder or, in the alternative, the felony murder of Holly Miller. Van Buren pleaded guilty and entered an *Alford/Newton*[1] plea.

As part of the plea agreement, the State agreed to recommend a standard mid-range sentence of 292 months. *State v. Van Buren*, 101 Wn. App. 206, 209, 2 P.3d 991, *review denied*, 142 Wn.2d 1015 (2000). Instead, the sentencing court imposed a 400-month exceptional sentence relying in part on the presentence investigator's recommendation of a 666-month exceptional sentence. *Van Buren*, 101 Wn. App. at 208-09. Van Buren appealed this sentence, and we found that the State had breached the plea agreement by advocating for an exceptional sentence. *Van Buren*, 101 Wn. App. at 217.

On remand before a different judge, Van Buren again entered an *Alford/Newton* plea, and the State again agreed to recommend a mid-range sentence of 292 months. Van Buren stipulated to the use of the declaration for determination of probable cause as the factual basis for her guilty plea.

According to the declaration, on June 11, 1998, to June 12, 1998, Van Buren, her boyfriend Keith Ruch, and his nephew Clifford Collier "bound and beat" Van Buren's former friend and roommate Holly Miller at her residence. Clerk's Papers (CP) at 3. Following this beating, the three "drove [Miller] to a remote area in Mason County, [Washington], where they beat and stabbed her to death." CP at 3.

The initial beating apparently was in response to Miller contacting the police about some missing cash and compact disks. Soon after the police contacted Van Buren and Ruch about Miller's report, they, along with Collier, confronted Miller at her home.

---

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970); *State v. Newton*, 87 Wn.2d 363, 552 P.2d 682 (1976).

Also according to the declaration, Ruch and Collier struck Miller; Collier then hit her with a baseball bat, causing her to lose consciousness. While Miller was unconscious, they tied her up, but she later regained consciousness, freed herself, confronted the defendants, and took refuge in the bathroom.

Van Buren reported that Ruch and Collier kicked in the bathroom door, renewed the assault, subdued and bound Miller, and placed her in the trunk of her car. Van Buren told detectives that she opened the trunk and put a pillow and blanket in the trunk and that she knew Miller was going to be killed.

The trio then drove Miller to a remote area where Ruch and Collier led her from the trunk. Van Buren said she heard Miller screaming, the screaming stopped, and Ruch and Collier later returned covered with blood. Ruch and Collier subsequently cleaned up and changed into clothes they had brought with them.

Van Buren later tried to sell Miller's car to a friend and admitted to the friend that they had murdered someone. An autopsy disclosed that Miller died from multiple blunt force trauma to her head and had sustained 11 knife wounds and one puncture wound to her neck and chest that contributed to her death.

In addition to the declaration for determination of probable cause, the second sentencing court also reviewed (1) a February 2001 presentence investigation report recommending a sentence of 333 months, (2) Van Buren's response to the sentencing report, and (3) letters from Miller's family. A letter from Miller's mother mentioned that Van Buren put on a pair of boots in order to stomp on Miller's head during the initial assault.[2] Neither the declaration of probable cause nor the February 2001 presentence investigation report contained this allegation.

---

[2] The portion of the letter the court referred to stated: "You deliberately put your boots on to have better affect [sic] stomping on Holly's head." CP at 48.

The court asked counsel if they were aware of any factual basis for the allegation. Defense counsel stated that he was not, and the prosecutor said that he did not want to comment on matters outside the statement on plea of guilty and the other information already provided to the court:

> Your Honor, in light of our recommendation and in light of the prior opinion by the Court of Appeals, I would prefer not to respond on matters that are outside the statement on plea of guilty and the other information that's provided to the Court at time of sentencing. So I would ask that the Court not require the State to disclose or State [sic] to the Court information that it has in its file or evidence that it might have presented at time of trial.

Report of Proceedings (RP) (Mar. 6, 2001) at 8.

The court stated that it understood the prosecutor's limitations but indicated that it still wanted any information relating to this allegation:

> I understand that the State has certain limitations, but the Court doesn't have. I can consider anything that the Court wishes to consider in the way of police reports or presentence investigations, statements. And I would like to know whether there is any truth to the statement made in [Miller's mother's statement].

RP (Mar. 6, 2001) at 8-9. The prosecutor asked the court not to order him to present evidence on the issue and suggested that the court request briefing from the parties and ask the presentence investigator to address the issue:

> Your Honor, I would make the request of the Court that the Court not order the State to present evidence on that matter at this time in light of our recommendation. If the Court is inclined to consider that matter apart from the statement that was written by Sandra Miller, I believe that we should be at recess and the Court should direct the parties to address that jointly and also direct the presentence writer to address the Court on that matter. But I would ask that the Court not require the State to go forward with evidence or information that it might have presented had this case gone to trial.

RP (Mar. 6, 2001) at 9.

The court then ordered the parties and the presentence investigator to provide any information related to the allegation:

> THE COURT: Well, I think that that's an important enough issue that I'm going to do that. I'm going to recess this matter and I want the counsel and the State to provide any information that would give any support to that allegation and the mother's, Ms. Sandra Miller's statement, in her report that this defendant actually changed shoes and stomped, [sic] and would appear to be deliberate cruelty on this victim.
>
> [Prosecutor]: Is the Court directing both attorneys to furnish the Court—
>
> THE COURT: Both attorneys.
>
> [Prosecutor]: —a brief on that issue?
>
> THE COURT: You can provide a brief on that issue and I would like to have the testimony, if there is testimony, that would support those allegations.
>
> [Prosecutor]: Your Honor, is the Court also directing that the [presentence investigation report] writer also respond on that issue?
>
> THE COURT: And the [presentence investigation report] writer. I want all the information that's available that I can review before I sentence this defendant.

RP (Mar. 6, 2001) at 9-10.

The court said that it was primarily concerned with learning whether the allegations, which would indicate deliberate cruelty, were true:

> I think it's very simple and clear what I'm concerned about. I want to know what are the real facts underlying the death of this victim, including issues that would bear on a deliberately cruel act, and I'm focusing on, as I've indicated, what this defendant allegedly did, if it's true, what is set forth in the document prepared by the victim's mother. And so I want the State to look at it. I want the defense to look at it. I want the presentence investigator to look at it. And I want any witnesses that are either going to negate or support those allegations here at the time I sentence this defendant.

RP (Mar. 6, 2001) at 11-12. The court told the prosecutor to present Van Buren's two codefendants, Collier and Ruch, at the next hearing and ordered the prosecutor to prepare a transport order.

In a memorandum in response to the court's order, the prosecutor recommended a 292-month sentence, stated that he would participate in the evidentiary hearing only if the court ordered him to do so, and said that he would limit this participation to avoid compromising the plea agreement:

> In light of the plea agreement and procedural history of this case, the state expects to limit its participation at the evidentiary hearing consistent with the requirements of its plea bargain. The state will conduct a limited examination of witnesses and respond to questions posed by the court.

CP at 64. The prosecutor also gave the court excerpts from transcribed interviews with Van Buren, Collier, and Ruch; a polygraph report and letter from a polygraph examiner related to the examination of Collier, a police report, the autopsy report, and some evidence lists.

According to these documents, Collier had stated that Van Buren was involved in the initial assault and had actively encouraged Ruch to murder Miller. Specifically, he stated that during the initial assault, which started at approximately 9:00 P.M., Van Buren or her sister broke a bottle of perfume over Miller's head; Van Buren hit and kicked Miller and then put on Ruch's discarded boots and "stomp[ed Miller's] head in"; and then she tied Miller up while Ruch repeatedly set her chest on fire with a flammable fluid. CP at 121. He stated that after they put Miller in the car trunk, they drove around for some time and collected some tools before they stopped at the murder site.

Collier further indicated that once they arrived at the murder site, Ruch started digging a grave. During the hour it took Ruch to dig the shallow grave, Miller, who was awake in the trunk, asked Collier what they planned to do and he told her that he believed they planned to kill her.

She asked Collier to help her, but when Collier asked Ruch and Van Buren if they could just leave Miller there rather than kill her, they refused.

Collier stated that when Ruch appeared to be having difficulty killing Miller with a knife, Van Buren repeatedly encouraged him to snap Miller's neck and that Van Buren stepped on and broke Miller's leg. He indicated that the ordeal ended when they finally killed Miller at about 5:30 A.M.

In a taped statement, Ruch admitted to assaulting and then killing Miller. At first, he asserted that Van Buren did not participate in the assault or the murder but he later stated that Van Buren did hit Miller during the initial assault. The presentence investigator also submitted a special report in which she stated that she did not consider the information about Van Buren putting on boots to stomp on Miller's head in her presentence report because it was an uncorroborated statement from Collier.

The court then conducted an evidentiary hearing, calling Collier and Ruch. The prosecutor said that he would not question them unless the court ordered him to do so. The court ordered the prosecutor to examine the witnesses: "I'm directing the State question in this hearing, the State question each individual co-defendant with reference to the sentencing before the Court at this time." RP (Mar. 16, 2001) at 4.

The court directed the prosecutor to ask Ruch what happened from the time the police confronted them about Miller's police report until the murder. The prosecutor asked the court to confirm that it was affirmatively directing him to question Ruch and asked the court to conduct the questioning instead. The court stated that it wanted the prosecutor to "carry the burden of asking the questions [it] indicated with reference to the circumstances surrounding these events that led to [Miller's death.]" RP (Mar. 16, 2001) at 5.

The prosecutor attempted to clarify exactly what the court wanted, and the court indicated that it wanted

"background history" that led up to the murder and information on whether Van Buren (1) changed into boots in order to stomp Miller, (2) held Miller down and beat on her, (3) participated in lighting Miller on fire, or (4) encouraged Ruch to break Miller's neck or further assault her. RP (Mar. 16, 2001) at 6. The prosecutor proceeded to question Ruch on these issues.

Ruch testified that both he and Van Buren participated in the initial assault and that Van Buren set Miller on fire using hairspray or perfume; participated in the actual stabbing; encouraged him to break Miller's neck; and, when this failed to kill Miller, brought him an ax or sledgehammer and told him to use it. He also testified that after they put Miller in the trunk, they "drove around for a few hours." RP (Mar. 16, 2001) at 10. The court then asked Ruch whether Miller's initial contact with the police precipitated the murder; Ruch stated that it did.

On cross-examination, Ruch confirmed that he initially told the police that he alone murdered Miller and set fire to her chest. But on the redirect ordered by the court, Ruch stated that the police never asked him about whether he or anyone else set fire to Miller's chest.

The court then asked Ruch about the boot incident. Ruch stated that during the initial assault, he took off his boots so he could use the shoelaces to tie up Miller, and Van Buren put on his boots and kicked Miller in the face.

The court then directed the prosecutor to question Collier. Collier testified that he remembered very little about the events and, in response to the court's questioning, he testified that he had blacked out from methamphetamine use during the initial assault.

On cross-examination, Collier stated that he remembered telling the prosecutor that Van Buren was with him in the car most of the time that Ruch was murdering Miller and that Van Buren did not participate in the murder. But Collier could not recall whether he told the police or the polygraph examiner that Ruch was the one who set Miller's

chest on fire. The defense then refreshed his memory with the transcript in which he said that Ruch was the person who did this.

The court then ordered the prosecutor to conduct redirect. The prosecutor attempted to refresh Collier's memory with the interview transcript and the letter from the polygraph examiner. Collier then testified that he remembered that Van Buren had put on boots and kicked Miller in the head during the initial assault but he said that he still had no independent recollection of what happened at the murder site or whether Van Buren participated in setting Miller's chest on fire. He acknowledged, however, that he made the statements quoted in the transcript and in the polygraph examiner's letter and that these statements were accurate at the time he made them.

Following this testimony, the prosecutor asked the court to inquire whether Van Buren had additional evidence to present and to hear statements from Miller's family. He also clarified that the State did not ask Miller's family to write the letters that triggered the evidentiary hearing; nor did it provide them with any of the reports they relied on when they wrote these letters.

After recognizing that the prosecutor was still recommending a 292-month sentence, the court allowed Miller's family and Van Buren's mother to speak. Van Buren's counsel then requested a 250-month sentence and Van Buren addressed the court.

The court imposed an exceptional sentence of 600 months. In its oral ruling, the court stated that the testimony established that Miller suffered greatly during the last several hours before her death and that Van Buren's actions constituted deliberate cruelty:

> There's no question in my mind, having heard the testimony of the only other two people that were present at the time this tragic situation occurred, tragic to the families that remain, including your parents, your mother and the family of the victim, that it was vicious. It was a horror for Ms. Holly Miller

for at least a day and a half, up to the point where even at the grave site I'm convinced that you stepped on her leg and broke her leg. You were involved with setting her afire with either hairspray or cologne. You were involved in taking boots that had been unlaced to tie her with and you took the time to put them on and kick her in the head. You encouraged Mr. Ruch to snap her neck. You stabbed her, I'm convinced. And she suffered extreme cruelty for a long period of time, something that no human being should ever suffer at the hands of another human being, and for that you will be punished outside the standard range, because this was deliberate cruelty, extraordinary cruelty. I'm going to sentence you to 50 years in the Department of Corrections.

You were just as much at fault as Mr. Ruch was who got life without the possibility of parole. You will still have some life after 50 years. I think that is fair under these circumstances.

RP (Mar. 16, 2001) at 59-60.

The prosecutor drafted proposed findings of fact and conclusions of law, which listed the following aggravating factors: (1) deliberate cruelty based on "the manner of the assault, the choice of the weapons, the length of time during which Ms. Miller suffered, and the extreme physical and emotional pain intentionally inflicted by defendant and her accomplices," (2) the victim's vulnerability, (3) multiple incidents over an extended period of time, and (4) domestic violence. CP at 219. The proposed findings and conclusions, which the court entered, also stated that any one of the factors alone would support the exceptional sentence.

### Violation of Plea Agreement

Van Buren argues that the prosecutor violated the plea agreement by participating in the evidentiary hearing and by including aggravating factors not addressed by the court in its oral ruling in the proposed findings of fact and conclusions of law.

A. Participation in Evidentiary Hearing

Van Buren initially asserts that the prosecutor effectively undercut the plea agreement by participating in the hear-

ing and "vigorously rehabilitating Collier during redirect." Br. of Appellant at 9.

■■ A plea agreement is a contract between the State and the defendant, and the prosecutor must adhere to the terms of the agreement by making the promised recommendation. *State v. Talley*, 134 Wn.2d 176, 182-83, 949 P.2d 358 (1998). The prosecutor need not make the recommendation enthusiastically but must "act in good faith, participate in the sentencing proceedings, answer the court's questions candidly . . . [and] not hold back relevant information regarding the plea agreement." *Talley*, 134 Wn.2d at 183. The prosecutor must not undercut the plea agreement explicitly or by conduct evidencing an intent to circumvent the agreement's terms. *State v. Sledge*, 133 Wn.2d 828, 840-41, 947 P.2d 1199 (1997).

■ ■ The prosecutor's mere participation in a court-ordered evidentiary hearing to present evidence supporting an exceptional sentence does not necessarily undercut the agreement:

> "[T]he prosecutor has an obligation as an officer of the court to participate in the hearing and present evidence that will help the court make its decision. Presenting evidence that will help the court make a decision does not amount to advocating against its earlier recommendation. Thus, it does not violate the terms of the plea agreement."

*Talley*, 134 Wn.2d at 186 (quoting *State v. Talley*, 83 Wn.ᵃ App. 750, 759, 923 P.2d 721 (1996)); *see also State v. Blakely*, 111 Wn. App. 851, 863, 47 P.3d 149, 155 (2002). But if the State presents evidence in such a way as to advocate for an exceptional sentence, for example, by emphasizing evidence that supports a finding of aggravating circumstances, or if it makes a recommendation to the court that suggests an exceptional sentence, this may breach the plea agreement. *Talley*, 134 Wn.2d at 186.

In determining whether the prosecutor undercut the agreement, we apply an objective standard focusing on the effect of the prosecutor's actions rather than on subjective

intent; we review the entire sentencing record for an indication of a contradiction, by word or conduct, of the agreed recommendation. *Talley*, 134 Wn.2d at 187; *State v. Van Buren*, 101 Wn. App. 206, 213, 2 P.3d 991 (2000); *State v. Jerde*, 93 Wn. App. 774, 780, 782, 970 P.2d 781 (1999). Actions such as requesting that the court hold an evidentiary hearing when the necessary information is already before the court, making unnecessary comments about written reports, aggressively questioning witnesses, underscoring aggravating factors in argument or summation, or other independent behavior contrary to the prosecutor's assertion that he or she is adhering to the recommendation, can undercut the agreement. *See Sledge*, 133 Wn.2d at 842-43; *Jerde*, 93 Wn. App. at 782.

■ Here, the prosecutor did not undercut the plea agreement by participating in the evidentiary hearing; he merely presented the information the court requested and complied with the court's order that he question the witnesses. Nor did he independently draw the court's attention to possible aggravating factors, initiate or suggest the evidentiary hearing, determine what witnesses would testify, or determine the scope of the questioning. And he did not comment on the weight of the evidence or the credibility of the witnesses. Finally, he continued to request the standard range sentence as agreed to in the plea agreement and continued to assert that this sentence was appropriate despite the court's apparent interest in examining additional facts. *See Blakely*, 111 Wn. App. at 863-64 (prosecutor did not violate plea agreement when he consistently recommended agreed upon sentence, participated in evidentiary hearing at court's directions, and submitted briefs addressing legal issues).

A prosecutor may participate in a court-ordered evidentiary hearing, and the prosecutor here gave no indication that he thought an exceptional sentence was appropriate or that he had rethought the appropriateness of the sentence he recommended under the plea agreement. Thus, the prosecutor did not violate the plea agreement by participating in this hearing.

## B. Proposed Findings of Fact and Conclusions of Law

 Van Buren next argues that the prosecutor's proposed findings of fact and conclusions of law improperly included aggravating factors not identified by the court in its oral ruling.

The court stated in its oral ruling that the evidence supported the aggravating factor of deliberate cruelty and that it was imposing an exceptional sentence (600 months) on this basis. But the written findings and conclusions of law contain additional aggravating factors.

The inclusion of these additional factors, however, did not materially compromise the plea agreement or otherwise harm Van Buren because the court had determined that the facts supported a finding of deliberate cruelty, the court imposed the exceptional sentence *before* it saw the proposed findings and conclusions, and the record strongly supports a finding of deliberate cruelty. *See Sledge*, 133 Wn.2d at 838-39 (plea agreement is like a contract and is analyzed according to contract principles). Accordingly, we conclude that the addition of these extraneous factors does not warrant relief.[3]

REAL FACTS DOCTRINE

Van Buren next asserts that the sentencing court violated the real facts doctrine when it relied on evidence related to the initial assault even though the State did not charge her with assault. Additionally, Van Buren asserts that the initial assault was not part of the same criminal conduct that resulted in Miller's murder.

 The real facts doctrine requires the sentencing court to base the defendant's sentence on the defendant's current conviction, criminal history, and the circumstances of the crime. *State v. Coats*, 84 Wn. App. 623, 626, 929 P.2d 507 (1997); *State v. Tierney*, 74 Wn. App. 346, 350, 872 P.2d

---

[3] We do not address whether the inclusion of these additional factors would be a violation of the plea agreement if the record did not support a finding of deliberate cruelty.

1145 (1994). The court may not base an exceptional sentence on facts *wholly unrelated* to the current offense or facts that would elevate the degree of crime charged above that of the charged crime. *Tierney*, 74 Wn. App. at 352. But the sentencing court may consider facts that establish elements of an additional uncharged crime when those facts are "part and parcel" of the current offense. *Tierney*, 74 Wn. App. at 352.

Here, the initial assault was "part and parcel" of the charged crime. Miller's murder was the culmination of a continuous sequence of events that started with the initial assault and ended with her death. *See Tierney*, 74 Wn. App. at 353-54 (sentencing court properly considered the defendant's periodic harassment of the victim over a four-year period before he committed the charged crimes of burglary and arson). Accordingly, the trial court did not err when it based the exceptional sentence on facts related to the initial assault.

Accordingly, we affirm.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HUNT, C.J., and HOUGHTON, J., concur.

Review denied at 148 Wn.2d 1018 (2003).

