IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>    Respondent,<br><br>  v.<br><br>JONATHAN JASON BARTOSEK,<br>AKA JONATHAN EDWARD<br>ACKERMAN and DAVID JOSEPH<br>CAPRON,<br><br>    Appellant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 80640-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br>FILED: January 27, 2020 |

SMITH, J. — Jonathan Ackerman[1] appeals the judgment and sentence for his conviction of second degree murder, for which he was sentenced to 295 months—the high end of the sentencing range—after pleading guilty. Ackerman contends that the prosecutor breached the State's agreement to recommend a 240-month sentence by, among other things, making remarks about motive, referring to the victim's vulnerability, and discussing Ackerman's criminal past and lack of remorse at the sentencing hearing. Ackerman also contends that remand is required to correct scrivener's errors in the judgment and sentence.

We hold that the prosecutor's conduct did not undercut the State's obligations in the plea agreement. We affirm but remand to the trial court with

---

[1] We refer to the appellant as Jonathan Ackerman for consistency with the parties' briefs.

directions to revise the judgment and sentence to specify that Ackerman's restitution obligations are joint and several with his codefendant.

FACTS

On October 20, 2016, a citizen found the body of 18-year-old Dakota Walker near a campground. Law enforcement identified Ackerman as a person of interest. According to a later-filed probable cause statement, Ackerman had been in a relationship with Walker, and Walker was the "'submissive'" or "'slave'" in the relationship. Witnesses reported that Ackerman "exercised a great deal of power and control over [Walker], including controlling his telephone privileges and his ability to have external conversations with his friends."

According to the probable cause statement, a witness told law enforcement that Ackerman told her he had been in prison with a man named Vincent Garlock and that they "protected each other." The witness stated that Ackerman and Garlock "were almost always together." Law enforcement contacted and interviewed Garlock, who stated that he, Ackerman, and Walker would drive around Thurston County at night, stealing mail from mailboxes. Garlock "described the relationship between [Ackerman] and [Walker] as 'tumultuous.'" According to the probable cause statement, Garlock said "[Ackerman] had told him he saw [Walker]'s phone where [Walker] had been 'taking notes' and writing down personal information on [Ackerman]." Garlock said that "[Ackerman] expressed his concern [that Walker] was going to call the police on him."

2

According to the probable cause statement, when asked when he last saw Walker, Garlock said that he, Ackerman, and Walker were in a van during the late night or early morning hours of October 19 or 20, 2016, when at some point Garlock fell asleep. Garlock recalled that he was awakened by a single gunshot and saw Ackerman in the driver's seat but did not see Walker. Garlock stated that Ackerman exited the van, and then Garlock heard six more gunshots. Ackerman returned to the van and told Garlock, "'It had to be done.'" Garlock and Ackerman then drove away.

According to the probable cause statement, a witness who had been emailing with Walker on October 19, 2016, noticed a change in the vernacular of the conversation in the early evening or late afternoon. She then believed she was not communicating with Walker, but with Ackerman. Another witness provided a Facebook Messenger conversation with a person using Walker's account. In the messages, the sender asked the witness for help, saying that he had been shot and was bleeding. The witness, who had messaged with Walker before, did not think that the tone used in the conversation was consistent with Walker's. She believed that the sender was Ackerman, who had used Walker's account to message her before.

Detectives later interviewed Ackerman. According to the probable cause statement, Ackerman stated that he, Walker, and Garlock were in Capitol Forest when they stopped so that Walker could go to the bathroom. Ackerman stated that "[h]e observed [Walker] on the passenger side of the vehicle urinating when

Garlock shot him through an open passenger side window." When Ackerman asked Garlock why he had murdered Walker, Garlock told him, "'He knew too much.'" According to the probable cause statement, Ackerman was referring to Walker's knowing Garlock's alias.

The State charged Ackerman with murder in the first degree/domestic violence while armed with a firearm. Garlock was jointly charged under a separate cause number. The State later amended the charge against Ackerman to murder in the second degree, and Ackerman pled guilty to that charge. Based on Ackerman's offender score, the standard range for second degree murder was 195 to 295 months. In the plea agreement, the State agreed to recommend a sentence of 240 months, the approximate middle of the standard range. The State agreed that the sentence would run concurrently with Ackerman's sentence in another case (identity theft case), in which Ackerman had pled guilty to attempted theft in the first degree, attempted theft of a motor vehicle, and identity theft in the second degree. The State and Ackerman also agreed that restitution would be joint and several between Ackerman and Garlock, and that Ackerman would "forfeit all property collected as evidence (except family and other personal photographs belonging to defendant)" that were found in the van involved in the shooting. (Boldface omitted.)

The trial court held a sentencing hearing in April 2018. Before sentencing Ackerman for the murder charge, the court issued the jointly recommended sentence in the identity theft case. After turning to the sentencing in this case, the court asked the State for its recommendation. The prosecutor began by

stating that "[t]he sole charge in this cause number is murder in the second degree" and that "[t]he agreed recommendation is for 240 months in prison." After outlining other aspects of the agreed sentence and asking the court to impose restitution and legal financial obligations, the prosecutor provided the court with a high-level timeline of the case. She explained that Ackerman and Garlock knew each other from prison in Pennsylvania and decided to move to Washington. She explained that while Garlock and Ackerman were in Oregon, Ackerman, who was 30 at the time, met Walker, who was 17, on an online dating app for men. The prosecutor stated that Walker had told a friend that "he wasn't really interested in a homosexual relationship but primarily was interest[ed] in getting out of the area where he was currently living." She then stated that Walker

> seemed to be a vulnerable young man. And I'll tell the court, one of the reasons I say that was just how long it took for—I mean, nobody knew that he was missing during the time that his body lay in the Capit[o]l Forest. So he was vulnerable, in that he wanted to get out. He maybe didn't have as much connection with all of his family members as you might hope for a 17-year-old young man.

The prosecutor went on to describe Ackerman and Garlock's "life of crime," in which they "supported themselves primarily by stealing mail" and took Walker with them. The prosecutor recounted Walker's friends' statements that Ackerman treated Walker "as if he owned him." She stated that "[w]hen you look at this case, it's clear that Ackerman had the motive to kill [Walker]." She stated that Ackerman had threatened Walker's friends and anyone that appeared to be helping Walker, indicating that he would kill them. She reported that "[o]ne witness even stated that Mr. Ackerman provided her a list of names and

5

addresses for her family members," and another person close to Walker said that

Ackerman "threatened her and said he would put a bullet between her eyes and

shoot her when she was least expecting it." The prosecutor stated, "[T]he State

believes that's what happened to [Walker], that he was shot when he was least

expecting it."

The prosecutor described Ackerman as "a pretty skilled criminal" but

explained that he made a "significant error" by keeping the GPS (global

positioning system) running in his vehicle in the days before and after Walker's

death. She explained that based on the GPS information, the State believed that

Walker was murdered the morning of October 17, 2016, and that Ackerman

visited the crime scene twice in the days after Walker's death. She stated that at

the same time, someone was sending messages to Walker's friends, pretending

to be Walker. The prosecutor concluded her remarks as follows:

> I tell all of that to Your Honor because I know the court is going to be sentencing Mr. Garlock later. Ultimately, this was a very difficult case, but the State could see that clearly Mr. Ackerman had the motive to kill . . . [Walker]. Both individuals said [Walker] was about to turn either Mr. Ackerman or Mr. Garlock in, because [Walker] had information about either Mr. Garlock or Mr. Ackerman being a wanted individual and also information about these folks' true identity.
> In the entire time that we've had this case, we've never been able to find any information about Mr. Garlock using aliases or being wanted. But we know that Mr. Ackerman has lots of aliases and . . . at the time was wanted by the U.S. marshals, and he still is today.
> One thing that is troubling, I think not only for everyone who has worked on this case but especially for . . . Walker['s mother] is that she doesn't know what happened in the moments of her son's last moments of his life. We know that he was shot six times. We know he had a wound on his hand, a wound that says to us that he wasn't killed right away, that he used his hand to deflect shot.
> We've not been able to get information about why was

6

[Walker] shot at that particular moment. The only thing that I can deduce is that Mr. Ackerman shot [Walker] when he was least expecting it, just like he threatened to do to others.

After hearing from Walker's mother, Ackerman's counsel, and Ackerman, the trial court sentenced Ackerman not to the recommended 240 months, but to the maximum term of 295 months. Ackerman appeals.

ANALYSIS

*Breach of Plea Agreement*

Ackerman asserts that the prosecutor's conduct constituted a breach of the plea agreement. We disagree.

"A plea agreement is a contract between the State and the defendant." State v. MacDonald, 183 Wn.2d 1, 8, 346 P.3d 748 (2015). Accordingly, under ordinary contract principles binding the parties to the agreement, "[t]he State . . . has a contractual duty of good faith, requiring that it not undercut the terms of the agreement, either explicitly or implicitly, by conduct evidencing intent to circumvent the terms of the plea agreement." MacDonald, 183 Wn.2d at 8. Additionally, because defendants waive significant rights by pleading guilty to a crime, "constitutional due process 'requires a prosecutor to adhere to the terms of the agreement' by recommending the agreed-upon sentence." MacDonald, 183 Wn.2d at 8 (quoting State v. Sledge, 133 Wn.2d 828, 839, 947 P.2d 1199 (1997)). "Whether a breach of a plea agreement occurred is an issue [we] review de novo." State v. Neisler, 191 Wn. App. 259, 265, 361 P.3d 278 (2015).

"We review a prosecutor's actions and comments objectively from the sentencing record as a whole to determine whether the plea agreement was

breached." State v. Carreno-Maldonado, 135 Wn. App. 77, 83, 143 P.3d 343 (2006). "Although the State need not enthusiastically make the sentencing recommendation, '[it] is obliged to act in good faith, participate in the sentencing proceedings, answer the court's questions candidly in accordance with [the duty of candor towards the tribunal][,] and . . . not hold back relevant information regarding the plea agreement." Carreno-Maldonado, 135 Wn. App. at 83 (most alterations in original) (quoting State v. Talley, 134 Wn.2d 176, 183, 949 P.2d 358 (1998)). "A breach occurs when the State offers unsolicited information by way of report, testimony, or argument that undercuts the State's obligations under the plea agreement." Carreno-Maldonado, 135 Wn. App. at 83.

Where, as here, the State agrees to make a midrange sentencing recommendation, "we recognize that it may be necessary to recount certain potentially aggravating facts in order to safeguard against the court imposing a lower sentence." Carreno-Maldonado, 135 Wn. App. at 84. That said, "a prosecutor must use great care in such circumstances, and the facts presented must not be of the type that make the crime more egregious than a typical crime of the same class." Carreno-Maldonado, 135 Wn. App. at 84-85.

Here, the prosecutor's conduct at sentencing did not amount to a breach of the plea agreement. Specifically, the trial court was not bound by the parties' midrange sentencing recommendation. Thus, the prosecutor's remarks regarding Walker's relative youth, the extreme control that Ackerman exercised in the relationship, Ackerman's concern that Walker would turn him in, and Ackerman's criminal past and attempts to impersonate Walker after his death are

fairly characterized as the recounting of facts to support the agreement to a midrange (as opposed to low-end) sentencing recommendation. Furthermore, these facts were consistent with allegations already before the court based on the probable cause affidavit, Walker's offender score calculation, and Walker's sentencing in the identity theft case. By bringing these themes to the court's attention at the sentencing hearing, the prosecutor did not engage in "outright advocacy" or advance aggravating circumstances that had no basis in the record. Cf. State v. Van Buren, 101 Wn. App. 206, 215, 2 P.3d 991 (2000) (State breaches plea agreement when it "crosses the line from objectively reporting facts that may have some bearing on the existence of aggravating factors to outright advocacy for those factors"); State v. Xaviar, 117 Wn. App. 196, 201, 69 P.3d 901 (2003) (concluding that breach occurred and observing that prosecutor referenced aggravating circumstances that went beyond those mentioned in presentence report). Finally, and although the prosecutor should not have elaborated as much as she did about Ackerman's threats against Walker's friends and the alleged circumstances of the shooting itself, the facts presented by the prosecutor were not of the type that made Ackerman's crime more egregious than other second degree murders. Rather, when viewed objectively in the context of the sentencing record as a whole, the obvious implication from the prosecutor's explanation that "I tell all of that to Your Honor because I know the court is going to be sentencing Mr. Garlock later" is that the State planned to recommend a lower sentence for Garlock despite Ackerman's claim that Garlock was the shooter. It was not inappropriate under these circumstances for the

prosecutor to explain why the State believed that Ackerman was the shooter and thus deserving of a higher sentence than Garlock. For these reasons, we conclude that the prosecutor's conduct did not amount to a breach of the plea agreement.

Ackerman disagrees, contending that "there is no need at a sentencing hearing for the trial court to 'distinguish' this defendant from a co-defendant who will later be sentenced." But he cites no authority to support his apparent contention that in a case involving codefendants for whom the State will recommend different sentences, a prosecutor is not permitted to justify the higher recommendation—or that she may do so only in the context of explaining the lower one.

Additionally, the cases on which Ackerman relies to argue that a breach occurred are distinguishable and do not require reversal here. In Xaviar, the State and the defendant agreed to a recommendation at the bottom of the standard range. 117 Wn. App. at 198. But at sentencing, the prosecutor emphasized the graveness of the crime, reiterated the charges that the State did not bring, noted that the State could have, but did not, ask for a 60-year exceptional sentence, highlighted aggravating factors that would support an exceptional sentence, and referred to the defendant as "'one of the most prolific child molesters that this office has ever seen.'" Xaviar, 117 Wn. App. at 198-201. We held that the prosecutor's conduct constituted a breach of the plea agreement. Xaviar, 117 Wn. App. at 198.

10

In <u>United States v. Whitney</u>, the government agreed both to recommend a low-end sentence and to not use any incriminating information divulged by the defendant. 673 F.3d 965, 968 (9th Cir. 2012). But at sentencing, the prosecutor stated that the defendant had "'supplied information to [the prosecutor] during his debriefing session that put himself in a supervisory role.'" <u>Whitney</u>, 673 F.3d at 969. She also asserted that the defendant "was a 'good thief,' and pointed to past offenses already included in the record . . . to contend that [he] had 're-victimized' his victims." <u>Whitney</u>, 673 F.3d at 971. The Ninth Circuit held that the prosecutor's remarks breached the plea agreement both by recounting the defendant's incriminating statements and by implicitly arguing for a higher sentence than the low-end sentence the government had agreed to recommend. <u>Whitney</u>, 673 F.3d at 970-71. The court observed that "when the government obligates itself to make a recommendation at the low end of the . . . range, it may not introduce information that serves no purpose but 'to influence the court to give a higher sentence.'" <u>Whitney</u>, 673 F.3d at 971 (quoting <u>United States v. Johnson</u>, 187 F.3d 1129, 1135 (9th Cir. 1999)).

In <u>State v. Williams</u>, the State agreed to recommend a sentence at the high end of the standard range. 103 Wn. App. 231, 233, 11 P.3d 878 (2000). But in a 16-page sentencing memorandum, the State included a section regarding exceptional sentences in which it addressed aggravating circumstances. <u>Williams</u>, 103 Wn. App. at 236. The State also argued in its sentencing memorandum that a sentence at the high end of the range "'is the MOST leniency that should be afforded to the defendant,'" an argument that the

prosecutor echoed at sentencing by advocating for "'*at least* a high-end recommendation.'" Williams, 103 Wn. App. at 237, 238. We concluded that by "set[ting] forth specific grounds for imposing an exceptional sentence," the prosecutor's conduct constituted a breach of the plea agreement. Williams, 103 Wn. App. at 239.

In both Van Buren and Jerde, the State agreed to recommend a standard range sentence, while the presentence investigation report (PSI) recommended an exceptional sentence. Van Buren, 101 Wn. App. at 209; Jerde, 93 Wn. App. 774, 776-77, 970 P.2d 781 (1999). At sentencing in each case, the prosecutor briefly noted the State's recommendation but proceeded to identify aggravating factors that the court could consider in support of an exceptional sentence, including factors that were not contained in the PSI. Van Buren, 101 Wn. App. at 215, 217; Jerde, 93 Wn. App. at 777-78, 782. In each case, we concluded that the prosecutor's conduct amounted to a breach of the plea agreement, making specific note of the prosecutor's reference to aggravating factors not mentioned in the PSI. Van Buren, 101 Wn. App. at 216 (observing that unnecessary highlighting of two aggravating factors proposed in the PSI did not, standing alone, cross the line into advocacy, but that unsolicited reference to an unmentioned factor "was more egregious"); Jerde, 93 Wn. App. 782 (observing that "both prosecutors advocated for an exceptional sentence by highlighting aggravating factors and even added an aggravating factor not found in the [PSI]").

Finally, in Carreno-Maldonado, the State agreed to make a low-end recommendation on one count of first degree rape, a midpoint recommendation of 240 months on five counts of second degree rape, and a high-end standard range recommendation on a count of second degree assault. Carreno-Maldonado, 135 Wn. App. at 79-80. At the sentencing hearing, the court set out the standard range sentence, acknowledged having reviewed the PSI and plea agreements, then asked the State if it had anything to add. Carreno-Maldonado, 135 Wn. App. at 80. The prosecutor then made a statement "'on behalf of the victims'" in which the prosecutor referred to the defendant's "'very extreme violent behavior'" and his preying on "'what would normally be considered a vulnerable segment of our community'" in carrying out "'crimes . . . so heinous and so violent [they] showed a complete disregard and disrespect for these women.'" Carreno-Maldonado, 135 Wn. App. at 80-81. Only when defense counsel objected and suggested that the State was failing to comply with the plea agreement did the prosecutor respond, "'I'm speaking here on behalf of the victims and on behalf of the [S]tate[.] And I'm not going beyond my recommendation in this case. It's an agreed recommendation. M[y] recommendation [for the second degree rape is] 240 months.'" Carreno-Maldonado, 135 Wn. App. at 81 (alterations in original).

Here, unlike in Xaviar and Whitney, where there was an agreed *low-end* recommendation, the parties agreed to a *midrange* recommendation. Thus, as discussed, it was not a breach for the prosecutor to discuss some potentially aggravating facts to support its midrange recommendation and "safeguard

13

against the court imposing a lower sentence." Carreno-Maldonado, 135 Wn. App. at 84. And unlike in Williams, the State did not repeatedly suggest that the recommended sentence was the minimum the court should impose. Furthermore, unlike in Van Buren and Jerde, there was no request for an exceptional sentence in a PSI of which the prosecutor took advantage by arguing specific aggravating factors to support an exceptional sentence. And finally, unlike in Carreno-Maldonado, where the prosecutor made a statement "on behalf of the victims" and did not even mention the State's recommendation until the defendant objected, the prosecutor here began with the State's recommendation and, as discussed, her remarks were appropriate in the context of justifying that midrange recommendation. Ackerman does not demonstrate that the prosecutor's remarks amounted to a breach of the plea agreement.

### Scrivener's Errors

As a final matter, Ackerman argues that remand is required to correct two scrivener's errors in the judgment and sentence. First, Ackerman argues that the trial court erred by failing to specify, consistent with the plea agreement, that Ackerman's liability for restitution obligations is joint and several with Garlock. The State concedes this error, and we accept the State's concession.

Second, Ackerman argues that remand is required because the trial court erred by not specifying that Ackerman is entitled to return of his personal property. The State contends that remand is not necessary because the parties agreed only that certain personal items would be excluded from forfeiture, but the trial court did not order forfeiture. We agree with the State.

14

We affirm but remand to the trial court with directions to revise the judgment and sentence to specify that Ackerman's restitution obligations are joint and several with Garlock.

WE CONCUR: