[No. 64921-9. En Banc.]

Argued September 24, 1997. Decided December 11, 1997.

THE STATE OF WASHINGTON, *Respondent,* v. NICHOLAS SLEDGE, *Petitioner.*

*Nielsen, Broman & Associates, P.L.L.C.*, by *Eric Broman* and *Eric J. Nielsen*, for petitioner.

*David R. Needy, Prosecuting Attorney*, and *Hilary A. Thomas, Deputy*, for respondent.

TALMADGE, J. — Despite a plea agreement for a standard range disposition of 21 to 28 weeks on a charge of taking a motor vehicle without permission, a juvenile court imposed an exceptional disposition of 103 weeks' confinement on Nicholas Sledge. The court's rationale was that Sledge should remain in custody until his 18th birthday, and assumed, in arriving at the disposition, Sledge would receive earned early release time.

Although the prosecutor adhered to the recommended disposition from the plea agreement, she insisted on a disposition hearing where she called and vigorously examined a probation counselor and a parole officer on aggravating factors supporting an exceptional disposition based on manifest injustice. She then gave a summation detailing the aggravating factors.

We reverse the exceptional disposition based on manifest injustice because the prosecutor's conduct undercut the plea agreement and the trial court erred in considering possible earned early release time in sentencing Sledge. We remand the case to the trial court where Sledge may choose to withdraw his plea or have a new disposition hearing before a different judge.

## ISSUES

1. Did the State breach the plea agreement by the conduct of the prosecuting attorney in the JuCR 7.12 disposition hearing?

2. Did the trial court base an exceptional disposition for manifest injustice on improper considerations when it assumed the juvenile would receive earned early release time?

## FACTS

The State (Skagit County Prosecutor) charged Nicholas Sledge with Taking a Motor Vehicle Without Permission, a felony (RCW 9A.56.070(1)). In a plea agreement, in return for Sledge's guilty plea on that felony charge, the State agreed to recommend a standard range confinement time of 21 to 28 weeks and not to file other charges against him. The juvenile court entered the agreed Statement of Child on Plea of Guilty.

The JuCR 7.12 disposition hearing occurred two weeks later, on October 31, 1995, before Skagit County Commissioner Susan K. Cook. Although Sledge stipulated in the Statement on Plea of Guilty to the use of the Manifest Injustice Report at the disposition hearing, the prosecutor insisted on a hearing with live witnesses. At the hearing, the State informed the trial court it was recommending the standard range confinement of 21 to 28 weeks, pursuant to the plea agreement:

> The State and defense are recommending the standard range. If I can explain the State's position somewhat, prior to taking the testimony with respect to the manifest injustice [report], while Mr. Sledge has a significant amount of criminal history over the course of his lifetime, and including fairly recent criminal history, most of his recent criminal history does not—but for a possession of stolen property in Snohomish County in August of this year, none of it is felony level criminal history.
>
> Furthermore, your Honor, it's the State's position that — and I have conveyed this to Mr. Ochs, Mr. Sledge's counsel, that once Mr. Sledge is released from JRA [Juvenile Rehabil-

itation Administration], if he commits another offense in this county, the State will be moving to decline him into adult court.

If he were to be sentenced to the standard range, I believe he would turn 17 before the time he was released, and it is the State's position that that's the best means of dealing with Mr. Sledge's situation at this time. The State feels strongly that Mr. Sledge does not warrant or merit any additional juvenile funds . . . . I don't think that the State should waste any more special funding on Mr. Sledge. That's the State's position, that's the reason why we're recommending the standard range, in addition to the fact that Mr. Sledge has agreed to plead guilty.

Report of Proceedings at 2-3. The State also informed the court the probation department had submitted a Manifest Injustice Report, recommending 103 weeks' confinement, with 44 days off for time served in detention.[1]

The Manifest Injustice Report, prepared by Sledge's probation officer, Mary June Curtis, revealed a life of unremitting criminality.[2] Nicholas Sledge has led a tragic life of parental neglect as a "street kid." His father is in prison in Oregon for bank robbery. He has had no contact with his mother, a topless dancer, since he was 11. He usually lives with his married brother. Now more than 18 years old, he first came into contact with law enforcement authorities when he was nine.

His official criminal history in the report lists 18 juvenile dispositions between the ages of 9 and 16, 5 of them resulting in sentences to detention. His conduct included

---

[1]The trial court must find a manifest injustice to depart from the standard range disposition. " 'Manifest injustice' means a disposition that would either impose an excessive penalty on the juvenile or would impose a serious, and clear danger to society in light of the purposes of this chapter." RCW 13.40.020(16).

[2]Juvenile probation counselors make recommendations to the court regarding the need for continued detention or shelter care of a child, RCW 13.04.040(2), prepare predisposition studies and must be present at disposition hearings to respond to questions regarding the predisposition study. RCW 13.04.040(4). *See State v. Poupart*, 54 Wn. App. 440, 447, 773 P.2d 893 (describing statutory authority and duties of probation counselors), *review denied*, 113 Wn.2d 1008, 779 P.2d 727 (1989).

escapes, institutional misconduct, and numerous parole revocations. Fifteen additional criminal referrals or contacts are listed, all except the present case, either dismissed or closed. In reaching her conclusion recommending an exceptional disposition, Curtis listed only one mitigating factor — Sledge's "conduct neither caused nor threatened serious bodily injury." Clerk's Papers at 11. She also listed three statutory aggravating factors, and 16 additional aggravating factors. Based on these factors, she recommended a disposition of 103 weeks' confinement.

At the hearing, the State called Curtis to testify about her report, although Sledge had not indicated any objection to trial court consideration of the report. Sledge did not object to Curtis' testifying. She detailed Sledge's long criminal history and gave her reasons for recommending an exceptional sentence:

Q. And you're recommending 103 weeks to JRA?

A. Yes, I am.

Q. Can you tell us why 103 weeks?

A. That will allow Nick to be placed at JRA until he's 18.

Q. Any other reasons, aside from the fact that's when he turns 18?

A. That was how I came up with the figure.

Report of Proceedings at 22. On cross-examination, Curtis explained in more detail:

Q. Okay, thank you. Now, how did you come to 103 weeks?

A. That is the time that—when the maximum term in the range is greater than one year, the minimum term in the range may be no less than 80 percent of the maximum term in that range.[3] So actually, his minimum would be I believe it's like 82 weeks. So if he did his minimum, he

---

[3]The witness correctly stated the terms of RCW 13.40.030(2)(c): "Where the maximum term in the range is more than one year, the minimum term in the range may be no less than eighty percent of the maximum term in the range."

would be out on his 18th birthday, he wouldn't actually spend a lot of time.[4]

Q. The law is once you give somebody a manifest injustice, [JRA] administratively determines that he would get 80 percent of that unless there's some circumstances exist based on his behavior.

A. Uh-huh.

Q. That warrant [sic] more than 80 percent of the range, right?

A. Correct.

Q. And that's how you came up with it?

A. Yes.

Q. You decided how can I give him 82 weeks, and go to 103, calculate backwards, is that right?

A. Correct.

Q. Your concern was just holding him into detention until he's 18—or DJR [Department of Juvenile Rehabilitation] until he's 18.

A. My plan was to hold him in DJR until he was 18 years old, yes.

Q. Why? Why did you come up with 18? Does that bear a rational relationship to any of the rehabilitative needs that you see, what programs in DJR would be available to you?

A. I don't think we're just talking about rehabilitation, we're talking about community safety. And you yourself said if he goes to adult, he will have less time to serve.[5] I believe

---

[4]The disposition hearing occurred on October 31, 1995. Sledge became 18 on April 12, 1997, a period of 78 weeks, not 82. Eighty percent of 103 weeks is 82 weeks. It appears Curtis added more weeks than necessary to achieve her purpose of keeping Sledge in detention until he became 18. Ninety-eight weeks would have been sufficient, as 78 is 80 percent of 98. This miscalculation is not an issue in this case, but might be on remand.

[5]The reference is to Sledge's counsel's statement to the trial court at the outset of the hearing, when he pointed out that under the Sentencing Reform

Nick needs a longer length of time, you know, to have some structure, maybe to have some programs. I'm hoping that will happen for him.

Report of Proceedings at 31-33.

In the direct examination, the State walked Curtis through her written report, step by step, getting Curtis to recite for the trial court the bases for all the aggravating factors Curtis had employed to reach her recommendation of an exceptional sentence. Finally, Sledge objected: "I think the report has been admitted, and everyone can read it. Is there anything—just to save time, is there anything over and above the report? I really don't know why we're going through it bit by bit, when it's been admitted for substantive purposes." Report of Proceedings at 15-16. The trial court nevertheless permitted further examination.

After the testimony of probation officer Curtis, the State called Bradley D. Garner, one of Sledge's parole officers. There is no written report by Garner in the record. Sledge did not object to Garner's testifying. The State elicited testimony from Garner, largely directed toward Sledge's institutional problems. Many of the State's questions to Garner exemplify the tenor of the direct examination:

Q. Do you have any information about Nicholas's success or lack thereof, whichever, during his last commit to JRA?

. . .

Q. He was paroled on March 29th. How did he do on parole until the time that he committed this offense on the 17th of June? [There ensued a nearly 4-page monologue from the witness about Sledge's difficult family life and his criminal brothers, almost none of which was responsive to the question, all without objection from Sledge's attorney.]

. . .

Act, Sledge would receive less time of confinement in the adult system than the 21 to 28 weeks the State was presently urging in the juvenile system.

Q. Were there any other violations of his parole while he was on parole?

. . .

Q. Do you have anything to add about the proposed aggravating factor of [sic] that he has a delinquent peer group?

. . .

Q. Do you have any recommendation of the Court for how long you think Nick or Mike, as you know him, should be sentenced to?

. . .

Q. Is it fair to say that you think that the prior commits, or that a commit of six months or seven months [apparently referring to the State's standard range recommendation of 21-28 weeks] would be insufficient for Nicholas?

. . .

Q. And you said that you wouldn't fault the probation department's recommending 103 weeks or until he's 18. When you say you wouldn't fault, does that mean you agree with their recommendation?

. . .

Q. And I believe you indicated that's because — essentially for the protection of the community, is that correct?

. . .

Q. Do you have any opinion as to whether or not there are any treatment issues for Nicholas? Ms. Curtis indicated that anger is an issue, as well as drug and alcohol. Do you see those as issues?

. . .

Q. What do you think the main thing is that Nicholas should focus on during his length of stay? There have been various things mentioned like developing long-term goals, getting his GED, getting anger management, drug and alcohol treatment.

Report of Proceedings at 37-48.

Finally, the State gave a summation of the evidence regarding the aggravating factors supporting an exceptional disposition:

[PROSECUTOR]: Your Honor, just a couple of comments with respect to the proposed aggravating factors, with respect to the probation department's recommendation. I do feel that some of them are duplicative, and it might be clearer to suggest just a couple of aggravating factors and finding that the other ones are a basis or reason to find that aggravating factor.

First off, there is a statutory aggravating factor of a recent criminal history or has failed to comply with conditions in a recent disposition order or diversion agreement. I believe that the proposed aggravating factor, short time since previous offense, would be subsumed within that statutory aggravating factor. I also would believe that offenses committed on parole or supervision would also fall within that statutory aggravating factor, since the basis for that is the fact that he committed an offense while on parole.

Then I would propose that there be one aggravating factor which essentially is numerous prior contacts with the juvenile system. I think the escalating criminal activity, the basis of that really appears to be the numerous incidence [sic] which I think would be subsumed within the numerous prior contacts with the juvenile system.

Then essentially a number of these factors that are proposed could fall within highly unlikely that attitudes and behavior could be changed within the period of standard range and/or prior sanctions of supervision and detention were not successful or had little effect. I do believe that the fact that he's highly likely to reoffend would be a basis or a reason to support the prior sanctions of supervision and detention were not successful, or vice versa.

I also feel that his compulsive behavior would be a reason to support the belief or the aggravating factor of highly likely to reoffend, or highly unlikely that attitudes or behavior could be changed within the period of standard range.

I also think that the violations in previous dispositions and diversions is a reason to believe that it's highly unlikely that

the attitudes and behavior could be changed within the period of standard range, and also the basis for believing that he's highly likely to reoffend.

I feel that there's an additional aggravating factor, "community supervision would not provide the structure necessary for rehabilitation," correction. I think that the unresponsiveness to the authority of officials in juvenile detention would be a reason to support that aggravating factor rather than being a separate aggravating factor. And that's really all I have to add.

Report of Proceedings at 52-54. In the face of this summation of aggravating factors supporting an exceptional sentence, the trial court was uncertain as to the State's recommendation:

THE COURT: All right, let me make sure I understand, here. The prosecuting attorney is recommending a sentence within the standard range, is that right?

[PROSECUTOR]: That's correct, your Honor, 21 to 28 weeks.

Report of Proceedings at 54. At the end of the hearing, the trial court made an oral ruling committing Sledge to 103 weeks of confinement.

The trial court entered its Order of Disposition on October 31, 1995, and Sledge appealed. The Court of Appeals affirmed the juvenile court's exceptional disposition. *State v. Sledge*, 83 Wn. App. 639, 922 P.2d 832 (1996). We granted review.

## ANALYSIS

### A. Breach of the Plea Agreement

 In analyzing this plea agreement in juvenile court, we resort to basic principles of contract. "Plea agreements are contracts." *State v. Mollichi*, 132 Wn.2d 80, 90, 936

P.2d 408 (1997).[6] Just as there is an implied duty of good faith and fair dealing in every contract, *Badgett v. Security State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991), the law imposes an implied promise by the State to act in good faith in plea agreements. *State v. Marler*, 32 Wn. App. 503, 508, 648 P.2d 903 (1982). *See also Correale v. United States*, 479 F.2d 944, 947 (1st Cir. 1973); *United States v. Bowler*, 585 F.2d 851, 854 (7th Cir. 1978); *United States v. Ailsworth*, 927 F. Supp. 1438, 1445 (D. Kan. 1996); *United States v. Rexach*, 896 F.2d 710, 714 (2d Cir.), *cert. denied*, 498 U.S. 969, 111 S. Ct. 433, 112 L. Ed. 2d 417 (1990); *United States v. Jones*, 58 F.3d 688, 692, (D.C. Cir. 1995).

But plea agreements are more than simple common-law contracts. Because they concern fundamental rights of the accused, constitutional due process considerations come into play. Due process requires a prosecutor to adhere to the terms of the agreement. *Santobello v. New York*, 404 U.S. 257, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971); *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986) (the defendant's underlying contract right is constitutionally based and therefore reflects concerns that differ fundamentally from and run wider than those of commercial contract law). Fairness is mandated to ensure public confidence in the administration of our justice system. *United States v. Carter*, 454 F.2d 426, 428 (4th Cir. 1972), *cert. denied*, 417 U.S. 933, 94 S. Ct. 2646, 41 L. Ed. 2d 237 (1974). *See State v. Tourtellotte*, 88 Wn.2d 579, 583, 564 P.2d 799 (1977). The State must comply with the terms of a plea bargain agreement. *State v. Hall*, 104 Wn.2d 486, 490, 706 P.2d 1074 (1985). *Accord Mabry v. Johnson*, 467 U.S. 504, 509, 104 S. Ct. 2543, 81 L. Ed. 2d 437 (1984) ("when the prose-

---

[6]This contract is between the State and the defendant. The court is not bound by the plea agreement. RCW 9.94A.090(2); *State v. Wakefield*, 130 Wn.2d 464, 474, 925 P.2d 183 (1996); *State v. Nelson*, 108 Wn.2d 491, 499, 740 P.2d 835 (1987). This is true in the juvenile court context as well.

Moreover, the probation counselor is not bound by the terms of the plea agreement. *State v. Poupart*, 54 Wn. App. 440, 447-48, 773 P.2d 893, *review denied*, 113 Wn.2d 1008 (1989).

cution breaches its promise with respect to an executed plea agreement, the defendant pleads guilty on a false premise, and hence his conviction cannot stand.").

Washington case law has discussed the parameters of the State's good faith obligation to effectuate the plea agreement. In some of our earlier cases subsequent to *Santobello*, we suggested a more aggressive duty on the part of a prosecutor to advocate for the sentence set forth in the plea agreement. In *State v. Peterson*, 97 Wn.2d 864, 866, 651 P.2d 211 (1982), for example, we stated: "the consideration which induces a defendant to plead guilty is not the prospect of a formal recitation by the prosecutor of the sentencing recommendation, but the prospect that the recommendation will be made with some degree of advocacy." This statement is inconsistent with our present understanding of the prosecutor's duty with regard to a plea agreement. *See, e.g., United States v. Benchimol*, 471 U.S. 453, 456, 105 S. Ct. 2103, 85 L. Ed. 2d 462 (1985) (under Fed. R. Crim. P. 11(e), there is no requirement for a prosecutor to support a sentencing recommendation with enthusiasm).

A prosecutor is obliged to fulfill the State's duty under the plea agreement by making the promised sentencing recommendation. The recommendation need not be made "enthusiastically." *State v. Coppin*, 57 Wn. App. 866, 874, 791 P.2d 228 (1990). The prosecutor, as an officer of the court, is obliged to participate in the sentencing proceedings, candidly answering the court's questions in accordance with RPC 3.3, and holding back no relevant information regarding the plea agreement. *See, e.g.*, RCW 9.94A.460 (State may not agree to withhold relevant information from court regarding plea agreement).

At the same time, however, the State has a concomitant duty not to undercut the terms of the agreement explicitly or by conduct evidencing an intent to circumvent the terms of the plea agreement. *In re Palodichuk*, 22 Wn. App. 107, 589 P.2d 269 (1978) (prosecutor undercut agreement by expressing to the court reservations about the

agreed to disposition). *See also State v. Davis*, 43 Wn. App. 832, 720 P.2d 454 (1986) (prosecutor did not breach agreement by advising court of two witnesses who wished to testify in favor of a prison term rather than probation); *State v. Collins*, 46 Wn. App. 636, 731 P.2d 1157, *review denied*, 108 Wn.2d 1026 (1987) (agreement breached when prosecutor inadvertently sent lengthier minimum term recommendation to Board of Prison Terms and Paroles than required by the agreement); *State v. Arko*, 52 Wn. App. 130, 758 P.2d 522 (1988) (State's advocacy for exceptional sentence on appeal after standard range recommendation in plea agreement was not a breach); *State v. Gutierrez*, 58 Wn. App. 70, 791 P.2d 275 (1990) (prosecutor did not breach agreement by presenting psychologist's report that did not fully support recommended sentence).

■ The principles enumerated in these cases regarding plea agreements apply with equal force in the juvenile context. *State v. Poupart*, 54 Wn. App. 440, 773 P.2d 893 (1989). In *Poupart*, the Court of Appeals held that a prosecutor did not breach a plea agreement when the prosecutor did not "forcefully" argue for a standard range sentence in the face of testimony from the juvenile's probation counselor and DCFS caseworker that an exceptional sentence based on manifest injustice was appropriate. The mere testimony of these officials was not a breach of the agreement. *Poupart*, 54 Wn. App. at 447-48.

Under our juvenile court rules, a disposition hearing must be held after a plea of guilty, JuCR 7.12(a), and must be conducted in accordance with RCW 13.40.150. JuCR 7.12(b). Under RCW 13.40.150, all relevant evidence may be received:

(1) In disposition hearings all relevant and material evidence, including oral and written reports, may be received by the court and may be relied upon to the extent of its probative value, even though such evidence may not be admissible in a hearing on the information. The youth or the youth's counsel and the prosecuting attorney shall be afforded an opportunity to examine and controvert written reports so

received and to cross-examine individuals making reports when such individuals are reasonably available, but sources of confidential information need not be disclosed. The prosecutor and counsel for the juvenile may submit recommendations for disposition.

Sledge argues "the prosecutor here effectively undermined the plea agreement by extensively examining the probation counselor's reasons for recommending statutory and nonstatutory aggravating factors." Pet. for Discretionary Review at 15. The State, while agreeing it was not permitted to undermine the plea agreement, responds that Sledge did not object to the oral testimony of the two witnesses, and that their testimony was only cumulative of the information in the Manifest Injustice Report before the trial court, (citing *State v. Crider*, 78 Wn. App. 849, 854, 899 P.2d 24 (1995) (no breach of plea agreement when testimony of witness called by State was cumulative of written report and corrected error in written report)); *see also State v. Todd*, 78 Wn.2d 362, 371, 474 P.2d 542 (1970) (admission of evidence that is merely cumulative is not prejudicial error). The Court of Appeals agreed with the State. The Court of Appeals and the State fail, however, to give sufficient significance to the fervor with which the prosecutor elicited testimony from probation counselor Curtis and parole officer Garner.

■ If it were the State's purpose to have the trial court adopt its standard range recommendation, there was no need for the State to insist upon a hearing with witnesses, as the report would be before the court pursuant to RCW 13.40.150. Nor was it necessary to ask Curtis over and over to elaborate on her bases for finding aggravating factors. The State's direct examination was precisely the kind of examination one would conduct of one's own expert witness. Although the State now argues the testimony it elicited in part tended to brand some aggravating factors as duplicative, the State did not challenge Curtis on those grounds during direct examination. Rather than conducting a direct examination, if it was the State's purpose to contradict and oppose the exceptional disposition Curtis was recommending, the State should have treated Curtis's testimony as hostile, and conducted a challenging cross-examination rather than an evocative direct examination.

Even more probative of the State's undermining of the plea agreement was the State's calling of parole officer Garner. Although the probation counselor has a statutory role to play in disposition hearings, the parole officer does not. The trial court did not request information from a parole officer, and there was no purpose to be served in his testimony other than to vitiate and contradict the State's standard range recommendation. However the State may justify the testimony of the probation counselor, it has no reason or excuse for the testimony of the parole officer other than to put before the trial court reasons why Sledge should receive an exceptional sentence.

Finally, the State's summation of the aggravating factors was a transparent attempt to sustain an exceptional sentence. A fair reading of the State's direct examination of probation counselor Curtis and parole officer Garner and negative summation reveals the State's unmistakable advocacy for an exceptional sentence. Even though the State told the trial court it was recommending a standard range sentence, it violated its duty of good faith and fair dealing by undercutting the recommendation, and thereby breached the plea agreement.[7]

## B. Basis for the Trial Court's Exceptional Disposition

While we could conclude our opinion with the analysis of the breach of the plea agreement, we are compelled to address the issue of the calculation of the exceptional disposition because the Court of Appeals' opinion is published and the trial court may need guidance on remand.

Sledge argues the trial court improperly took into account the possibility of early release in determining the length of his sentence: "The length of the disposition was

[7]Our conclusion that the State breached the plea agreement is not meant to indicate we think the State purposefully set about to undermine the plea bargain and obtain an exceptional disposition of confinement. The focus of this decision is on the effect of the State's actions, not the intent behind them. We recognize a conflict may result when the State assumes the role of presenting evidence to a court that may contradict the State's sentencing recommendation, as in this case, where the State presented the testimony of the probation officer and parole officer. Keeping in mind the paramount due process rights of the defendant, however, we hold simply the State may not act so as to undermine a plea agreement to which it is a party. The trial court has ample means for eliciting evidence and taking testimony that need not involve the State in a conflict of interest.

based solely on the court's determination that Nick should be confined until his 18th birthday." Supplemental Br. of Pet'r at 6.

Indeed, there is little question that Mary June Curtis, in calculating the 103-week recommendation upon which the trial court based its disposition, assumed Sledge would earn early release time. Moreover, there is little doubt of the trial court's intent to confine Sledge until the age of 18:

> Now, there's been some comment in this courtroom that no period of confinement would be sufficient, and that Mr. Sledge's behavior is not affectable, and I am simply refusing to believe that. I think that someone who is as young as 16 years old cannot simply be discarded as unretrievable or ir- retrievable. I think that it's important that we make every effort to see to it that this type of behavior is addressed before Mr. Sledge turns 18.

Report of Proceedings at 60. The trial court was sincerely concerned with providing Sledge an opportunity to receive whatever counseling and rehabilitation were available in juvenile detention, while at the same time isolating him from the public.[8]

A trial court may enter an exceptional disposition beyond the standard range only if it finds a manifest injustice by clear and convincing evidence. RCW 13.40.160(4)(c). The trial court's determination is reviewed for manifest abuse of discretion. *State v. B.E.W.*, 65 Wn. App. 370, 375, 828 P.2d 87 (1992). The issue here is whether the disposition was "clearly excessive." RCW 13.40.230(2).

Sledge argues the trial court improperly took into consideration the possibility of early release by imposing the 103-week disposition. This Court has held in the

---

[8]Nothing in the record indicates the trial court contemplated a specific treat- ment or rehabilitative program of a specific duration in setting the 103-week pe- riod. Unlike the adult Sentencing Reform Act, the Juvenile Justice Act retains treatment, in addition to punishment, as one of its express goals. RCW 13.40.010(2)(f). We do not express an opinion in this case as to whether a sentenc- ing court could consider earned early release time as a factor in ensuring a juve- nile be committed to JRA for a time sufficient to complete a specific treatment program requiring a specific duration to complete.

context of adult sentencing, "[I]t would be inappropriate to impose a sentence outside the presumptive range based on an entirely speculative prediction of the likely behavior of an offender while in confinement." *State v. Wakefield*, 130 Wn.2d 464, 478, 925 P.2d 183 (1996) (citing *State v. Fisher*, 108 Wn.2d 419, 429 n.6, 739 P.2d 683 (1987)). "[E]arned early time release is to be considered only after the offender has begun serving his sentence." *Fisher*, 108 Wn.2d at 429 n.6.

In numerous cases, the Court of Appeals followed the same rule in the juvenile court setting. In *State v. Bourgeois*, 72 Wn. App. 650, 660, 866 P.2d 43 (1994), the court said the *Fisher* reasoning applies "with equal force in the juvenile context . . . when a juvenile court considers the possibility of an administrative early release decision, it usurps the Department [of Social and Health Services'] statutory authority." In *State v. S.H.*, 75 Wn. App. 1, 15-16, 877 P.2d 205 (1994), *review denied*, 125 Wn.2d 1016, 890 P.2d 20 (1995), the court relied on *Bourgeois* in holding the trial court had erred by increasing a disposition recommendation based on the possibility of early release. *See also State v. Ross*, 71 Wn. App. 556, 861 P.2d 473, 883 P.2d 329 (1993), *review denied*, 123 Wn.2d 1019 (1994); *State v. Vaughn*, 83 Wn. App. 669, 924 P.2d 27 (1996), *review denied*, 131 Wn.2d 1018, 936 P.2d 417 (1997).

We see no reason to depart from the principles expressed in *Wakefield, Fisher*, or their juvenile counterparts in the absence of facts documenting a need for confinement for a specific treatment program requiring a set duration to successfully complete. To assume a juvenile offender will earn a discretionary early release invites too much speculation by the sentencing court.

The facts in Sledge's case confirm the speculative nature of this undertaking. The trial court wanted to confine Sledge until he was 18 and assumed a 103-week disposition would achieve this result when a 20 percent earned early release time factor was made part of the calculation. First, as previously noted, the court calculated the sentence incorrectly. See n.4, *supra*. Second, given Sledge's

record of incorrigible behavior both in and out of juvenile institutions, it is difficult to believe he would be an outstanding candidate for early release. The greater likelihood is that Sledge would serve all or nearly all of his sentence, pushing his release date past his 18th birthday. Finally, the trial court failed to consider Sledge's entitlement to mandatory release pending his appeal of an exceptional sentence based on a manifest injustice finding. RCW 13.40.230(5).

Under the facts of this case, the trial court erred in utilizing a speculative entitlement to earned early release time in calculating the exceptional disposition.

## CONCLUSION

The State breached its plea agreement with Sledge when it undercut the plea agreement by effectively advocating for an exceptional sentence. Further, with no specific juvenile treatment program requiring a specific duration to complete, a trial judge may not take into consideration the possibility of early release in imposing an exceptional disposition, as the entitlement to such release is entirely too speculative.

We vacate the trial court's disposition and remand this case to the trial court where Sledge may choose to withdraw his guilty plea or have a new JuCR 7.12 disposition hearing before another judge.[9]

DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, MADSEN, ALEXANDER, and SANDERS, JJ., concur.

Reconsideration denied January 28, 1998.

---

[9]Sledge requested the remand for a new disposition hearing before another judge. We do not cast aspersions on the trial court here by this remedy, but provide for a new judge at the disposition hearing in light of the trial court's already-expressed views on the disposition.