IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  39588-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW JAMES LOWE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — After pleading guilty to four sex offenses, Matthew Lowe appeals, contending the State breached the plea agreement.  Mr. Lowe also appeals the trial court's imposition of several legal financial obligations (LFOs).

We affirm Mr. Lowe's judgment and sentence and remand for the trial court to strike the victim penalty assessment (VPA), the DNA collection fee, and the community custody supervision fees from the judgment and sentence.

BACKGROUND

Mr. Lowe sexually abused Victim A[1] for five years, from when she was 13 years old until she disclosed the abuse at age 18.  After Victim A's father passed away, Mr.

---

[1] Although this court's general order of September 22, 2023, requires reference to victims by their initials, the trial court record consistently identifies the victims as A, B, and C.  For clarity and consistency, this memorandum follows the convention used by the parties in the trial court.

Lowe assumed a father figure role to Victim A and abused his position of trust to gain access to her. The abuse was documented through innumerable images, many of which Mr. Lowe shared with a friend. Mr. Lowe further manipulated Victim A to convince Victims B and C, who were also children, to share sexually explicit images of themselves with him. Due to the egregiousness of the facts underlying Mr. Lowe's convictions, the superior court judge "was worried for [the] mental health of people in the courtroom" had the case proceeded to trial. Rep. of Proc. (RP) at 339.

Mr. Lowe initially exercised his constitutional right to a jury trial. However, the first trial abruptly ended in a mistrial when one of the prospective jurors tainted the venire. Several months later, at the start of the second trial, Mr. Lowe and the State entered into a plea agreement following heavy negotiations. The plea involved the State dismissing three of the seven original counts, dismissing all aggravators, and the State and victims jointly recommending 210 months of confinement, the low-end of the standard range. In exchange, Mr. Lowe agreed to plead guilty to the remaining four counts and accept forfeiture of all seized property. To his credit, Mr. Lowe voluntarily entered sex offender treatment almost immediately after his arrest, and his presentence investigation indicated an ongoing willingness to engage in treatment while incarcerated.

Because the primary issue is whether the State breached the plea agreement by undercutting the agreed sentencing recommendation, the State's recommendation is reproduced below.

> [T]here is so much more to this case than what was contained in that Probable Cause Affidavit or what was contained in the original trial memorandum that was submitted by the state. The charges in this case primarily relate to one victim who we have referred to in all materials as Victim A. . . . But I think something that has been lost is that she is not the only victim in this case. There are two other victims.
>
> And from the state's perspective one of the things that is so dangerous about Mr. Lowe is that he was able to present himself as an upstanding citizen of Benton County, a man who participated and led groups in the church, a man who was a dedicated husband and father. But he was also a man who utilized those roles to facilitate his contact with Victim A. And Victim A then reached out to other friends and ended up introducing them to Mr. Lowe. And Mr. Lowe used her to do that.
>
> And the Victim Impact Statement that your Honor has before you, Victim A is so introspective and has talked about all of the many far-reaching impacts that Mr. Lowe's conduct had on her and her life, but I did notice one of the things that was missing was the introduction of Mr. Lowe to these other two young ladies. And I have no doubt that that is because that is simply crushing to Victim A. Because not only was she herself engaged in this awful, awful ongoing cycle of physical and sexual abuse with Mr. Lowe, but she also made it possible for him to victimize these two other girls. And obviously she was 13 years old at the time. She had no idea what she was doing. And it's now only as an adult that she can look back and see the impact on herself but also the impact on the other individuals who were involved.
>
> Mr. Lowe made Victim A complicit in what he was doing. And I have no doubt that that fact is one of the most searing and difficult things for Victim A to continue to process. And it was evident in our conversations with her throughout this case that that was incredibly difficult for her.

3

This was not something that only went on for a year or two years while she was a teenager. It went on for an extended period of time. And all the while this was going on, Mr. Lowe was being lauded as an outstanding community member, who took care of Victim A. Victim A's own mother trusted the defendant to pick her up from middle school. That's how many of the initial sexual abuse incidents and physical abuse incidents occurred. He actually picked her up from middle school. And it went on from there.

Mr. Lowe is the type of individual that we cannot have in our community, because he is so good at manipulating others and making them believe that he is the man that he presents to other adults in our community. But Victim A is the individual who saw the other side, as are Victim B and Victim C.

In resolving this case, the state heavily weighed the impact that a trial would have, not just on Victim A but also on Victim B and on Victim C. And ultimately, despite the gruesome nature of this case, as your Honor is fully aware from all of the documents that have been submitted, we came to the conclusion that it was appropriate for us to go forward and to recommend the bottom end of the range on Count I, which is the rape of a child in the second degree count, and we believe that that is very appropriate.

During the course of the investigation of this case, Victim A continually talked about how Mr. Lowe would tell her that he was doing things for her benefit. One example, and there was quite a bit of forensic material that confirmed this, he would do things like telling her she had to go to bed at a certain time. So he would have her take a picture of the digital clock in her kitchen to confirm that she was at home and that she was going to bed. He would also require her to do things like schoolwork, things that uninvolved individuals would believe were very positive things, things that [Victim A]'s mother even, the Victim A's mother believed were positive things. Ultimately, your Honor, the only positive thing that Mr. Lowe has ever done for Victim A is take responsibility for what he did. And that is why we are recommending 210 months as well.

We're recommending the top end of the range on Count III, which is rape of a child in the third degree. That's 60 months. We're recommending the top end of the range on Count IV, which is sexual exploitation of a

4

minor and 120 months. And we're recommending the top end of the range on Count VII, which is possession of depiction of minors engaged in sexually explicit conduct, and that's 83 months.

Count I is an indeterminate offense, also includes lifetime supervision with the Department of Corrections. The other three counts involve 36 months of supervision with the Department of Corrections. And the state has delineated all of that in the Judgment and Sentence.

We are also asking that Court impose all of the conditions as laid out in the Appendix H, as well as the no-contact order for life with all of the victims in this matter. The state has also addressed forfeiture of all of the items that were utilized by Mr. Lowe, either to facilitate the offense or to document the images that are present in this case.

And ultimately, your Honor, we would ask that you follow the recommendation. We believe that a trial based upon the input from the victims in this case would have been devastating. And so while this is an extremely egregious case, we believe that that recommendation is appropriate and recognizes the impact that may otherwise have occurred, even though each of these victims is incredibly strong and would have been able to be here.

RP at 316-20. The State's recommendation was presented without objection from defense counsel.

After the State offered its recommendation, Victim A's mother briefly addressed the court. Victim A then made a statement, followed by her advocate who read Victim A's victim impact statement into the record.

Defense counsel tendered an argument in support of the agreed recommendation, emphasizing that Mr. Lowe is more than just the acts he pleaded guilty to and that he possessed several positive attributes. Exercising his right to allocution, Mr. Lowe apologized to God, his family, Victim A, his wife, and the judge.

5

Finally, the court issued its sentence:

[W]hat I prefer to do is collect my thoughts, I step off the bench, and we don't have this awkward where everybody has to be quiet, staring. So I'll take five, at most ten, and I'll be back in.

. . . .

So I want to start. This sounds awkward saying it, but I want to thank some people. This case for me personally as a judge, just difficult knowing it was going to happen, and the fact that the parties came together and were able to reach a resolution. I was in here and out of the courtroom during this process, and I didn't see it, but you could feel it in the air. We were down here, and you were upstairs, and I know that took a lot, a lot of effort and involved a lot of people and a lot of emotions, and I have been in all the parties' shoes. I have been in your shoes. I have been in your shoes. And throughout the course of this trial or throughout the course of me hearing the hearings and jury selections, twice. It's been a very professional presentation. And I could see that it would be difficult to do.

Law enforcement that had to do this investigation, can't be the same after viewing the stuff, either, and seeing what has occurred here. The victims, I just, I don't know how to respond to that. The strength that they have to come forward, the strength they have to continue to persevere is something that I could never experience.

The statement where, talked about having super powers, how else would you describe it? How else would you describe it? And when she said in her statement she didn't want to sound vindictive or vengeful, you get to. You get to want him to rot in hell. I mean it's actually therapeutic to say that. I mean to say that not be vindictive, that's the strength of somebody I can't even understand. So it is a super power.

And listening to her statement was extremely impactful on me. I can't ever be the same. I waved signs in the cold rain for this job, did first three murder trials, nothing. Those victims and the family's victims, the victims are gone. The families have continuing pain. In this particular case the victimization will never end. There are people that aren't even born yet that will be victims of your conduct. There are—the wide-spread devastation just can't be understated.

6

Have been in both of your shoes, both counsel's shoes. The process doesn't work, not with this case, but with all of the cases, if the courts don't give some respect to agreements that are reached. If defense can't count on the court's giving some deference to agreements, agreements will never be reached. The system will shut down. I mean it will literally shut down. The Court also has that in mind.

. . . .

The parties have reached an agreement for the bottom-of-the-range sentence on Count I of 210 months. The Court struggles with that. As I indicated, for the process to work, the Court has to respect them. And I'm trying to think of the last time I didn't follow an agreement. I haven't followed every agreement, but it's been a while. I know the parties worked hard on this, and I know the parties went upstairs and downstairs and with the duly elected official and victims were involved. I want to respect that process. But I don't know who all is here. I know some of the people here who spoke. Everybody in this room, their sentence is going to go on forever. And so the Court is not going to follow the agreement.

And on Count I the Court's going to impose the top of the range of 280 months. Count III, 60 months, top of the range. Count V, top of the range, 120 months. And on Count VII, top of the range, 83 months.

I appreciate the process of a negotiation, but our community can't be the same. And I think this top of the range is appropriate. I will say that accepting responsibility and resolving this and not having to put the people through trial is a step, is a step. I was worried about trial. I was worried about its impact. Having prepared for trial and the trial briefs that I read, I was worried for mental health of people in the courtroom.

RP at 334-36, 339.

## ANALYSIS

On appeal, Mr. Lowe contends the State's recommendation at the sentencing hearing breached the plea agreement, thereby violating his right to due process, and that the trial court erred when it ordered several LFOs. Mr. Lowe raises additional issues in a statement of additional grounds (SAG).

7

APPEALABILITY

As a preliminary matter, we address the appealability of the State's alleged breach of the plea agreement. For the first time on appeal, Mr. Lowe asserts the State breached the plea agreement, thereby violating his right to due process. Generally, a party may not raise a new argument on appeal that was not presented to the trial court. *In re Det. of Ambers*, 160 Wn.2d 543, 557 n.6, 158 P.3d 1144 (2007). To preserve for appellate review a perceived error, a party must inform the trial court of the applicable rule of law and afford the trial court an opportunity to correct any error. *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983).

Notwithstanding, RAP 2.5(a)(3) allows an appellant to raise for the first time on appeal a "manifest error affecting a constitutional right." When a prosecutor breaches a plea agreement, it "undercuts the basis for the waiver of constitutional rights implicit in the plea." *State v. Tourtellotte*, 88 Wn.2d 579, 584, 564 P.2d 799 (1977). The breach of a plea agreement constitutes an error affecting a constitutional right for purposes of RAP 2.5(a)(3).

However, as explained in *State v. Sanchez*, 146 Wn.2d 339, 346, 46 P.3d 774 (2002), the fact that an error affects a constitutional right does not mean it can always be raised for the first time on appeal. The error must also be "manifest." *Id.* An error is considered "manifest" if the appellant shows actual prejudice. *State v. McFarland*, 127

8

Wn.2d 322, 333, 899 P.2d 1251 (1995). Whether an error is "manifest" must be decided on a case-by-case basis, depending in large part on whether "the facts necessary to review the claim are in the record." *Sanchez*, 146 Wn.2d at 346.

As the appellant, Mr. Lowe carries the burden of demonstrating that the alleged error is manifest. *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). Rather than address whether the alleged error is manifest, Mr. Lowe asserts RAP 2.5(a)(3) is inapplicable because this court reviews breach of plea agreement claims de novo. Reply Br. of Appellant at 1-2. We agree; constitutional claims are always reviewed de novo. Yet, some constitutional claims cannot be raised for the first time on appeal.

Regardless of whether an error meets the requirements of RAP 2.5(a)(3), we retain discretion under RAP 2.5(a) "to accept review of claimed error[s] not appealed as a matter of right." *State v. Blazina*, 182 Wn.2d 827, 834-35, 344 P.3d 680 (2015). Here, we exercise that discretion and review Mr. Lowe's unpreserved alleged error.

BREACH OF PLEA AGREEMENT

We review de novo claims that the State breached a plea agreement. *State v. Molnar*, 198 Wn.2d 500, 513, 497 P.3d 858 (2021). A plea agreement is a contract. *State v. Mollichi*, 132 Wn.2d 80, 91, 936 P.2d 408 (1997). However, because plea agreements concern the fundamental rights of the accused, thereby implicating due process protections, they are more than simple common law contracts. *State v. Sledge*,

9

133 Wn.2d 828, 839, 947 P.2d 1199 (1997). "Due process requires a prosecutor to adhere to the terms of the agreement." *Id.* "A prosecutor is obliged to fulfill the State's duty under the plea agreement by making the promised sentencing recommendation. The recommendation need not be made enthusiastically." *Id.* at 840 (internal quotation marks omitted).

"The prosecutor, as an officer of the court, is obliged to participate in the sentencing proceedings, candidly answering the court's questions in accordance with RPC 3.3, and holding back no relevant information regarding the plea agreement." *Id.* (citing RCW 9.94A.460). Simultaneously, however, the State has a concomitant duty not to undermine the terms of the agreement either explicitly or through conduct demonstrating an intent to evade the terms of the plea agreement. *Id.*

Just because the parties reached an agreed recommendation does not mean the sentencing court "[sh]ould be faced with a one-sided hearing." *State v. Talley*, 134 Wn.2d 176, 186, 949 P.2d 358 (1998). "The State must be allowed to use descriptive words in addition to stipulated facts because, while the State's 'recommendation need not be made enthusiastically,' it need not be made so unenthusiastically that it is unhelpful to the sentencing court." *Molnar*, 198 Wn.2d at 517 (emphasis omitted) (internal quotation marks omitted) (quoting *Sledge*, 133 Wn.2d at 840). Thus, the mere mention of aggravating facts does not automatically breach the plea deal. *Id.* at 516.

Ultimately, "we must 'review [the] prosecutor's actions and comments objectively from the sentencing record as a whole to determine whether the plea agreement was breached.'" *State v. Ramos*, 187 Wn.2d 420, 433, 387 P.3d 650 (2017) (alteration in original) (quoting *State v. Carreno-Maldonado*, 135 Wn. App. 77, 83, 143 P.3d 343 (2006)). "A breach occurs when the State 'undercut[s] the terms of the agreement explicitly or implicitly by conduct evidencing an intent to circumvent the terms of the plea agreement.'" *Id.* (alteration in original) (quoting *Carreno-Maldonado*, 135 Wn. App. at 83). "Nevertheless, we review the State's actions objectively, focusing 'on the effect of the State's actions, not the intent behind them.'" *Id.* (quoting *Sledge*, 133 Wn.2d at 843 n.7).

Here, the State agreed to recommend the low end of the standard range. Because the recommendation was for the low end, Mr. Lowe argues the State lacked justification to present the following statements to the court:

- "But I think something that has been lost is that [Victim A] is not the only victim in this case. There are two other victims." RP at 316.
- "[O]ne of the things that was missing [from the victim impact statement] was the introduction of Mr. Lowe to these other two young ladies. And I have no doubt that that is because that is simply crushing to Victim A. Because not only was she herself engaged in this awful, awful ongoing cycle of physical and sexual abuse with Mr. Lowe, but she also made it possible for him to victimize these two other girls." RP at 317.
- "Mr. Lowe is the type of individual that we cannot have in our community, because he is so good at manipulating others and making them believe that he is the man that he presents to other adults in our community." RP at 318.
- "[T]his is an extremely egregious case." RP at 320.

11

In addition to the foregoing comments, Mr. Lowe points to the statement that the plea was "'heavily negotiated'" to suggest that the State "never appeared fully on board" with the agreement. Br. of Appellant at 13 (quoting RP at 331). However, that statement was made by defense counsel, not the State. Even then, heavy negotiations do not necessarily imply that the State was not "on board" with the agreement. Rather, it means the resulting settlement took substantial effort. Moreover, informing the court that an agreement was "heavily negotiated" is usually an implicit plea to the court to honor the parties' agreement.

With respect to Victims B and C, Mr. Lowe suggests that the State's references to them was improper because the charges he pleaded guilty to committing related only to Victim A. Br. of Appellant at 14; Reply Br. of Appellant at 3. Mr. Lowe is incorrect. In the second amended information, three of the four counts Mr. Lowe pleaded guilty to committing listed Victim A as the victim. The last count, possession of child pornography, did not list a victim. The statement of defendant on plea of guilty acknowledged that the settlement was "agreed to by the State and victims." Clerk's Papers (CP) at 78. The specification of "victims," in the plural form, indicates that the plea was intended to encompass crimes against all three victims, not just Victim A. This intent is reinforced by Mr. Lowe's personal statement that he possessed printed matter "depicting minors," again plural, "engaged in sexually explicit conduct." CP at 84.

12

Absent from the record is any indication that the plea was intended to exclude Victims B and C.

Importantly, the State's references to Victims B and C were brief and fairly innocuous. This is not a case where the State went into excruciating detail about the facts. *See State v. Xaviar*, 117 Wn. App. 196, 200, 69 P.3d 901 (2003); *Sledge*, 133 Wn.2d at 830; *Carreno-Maldonado*, 135 Wn. App. at 80-81. Rather, the State merely reminded the court that there were three victims, not one. Such a brief reminder cannot reasonably be read as undermining the plea agreement or advocating for a more severe penalty than was negotiated by the parties. Considering the rights crime victims have in Washington, and the expectation that the State will represent their views to the court, it would have been unwonted for the State to make absolutely no mention of Victims B or C. *See* WASH. CONST. art. I, § 35; ch. 7.69 RCW.

The next statement Mr. Lowe challenges is, "[T]his is an extremely egregious case." RP at 320. Alone, this statement does not support the plea agreement, but neither does it undercut it. Rape of a child in the second degree (the offense that resulted in the lengthiest sentence) is always extremely egregious. It is a class A felony punishable by up to life imprisonment and is classified as a most serious offense for purposes of Washington's persistent offender statute. RCW 9A.44.076; RCW 9A.20.021(1)(a);

13

RCW 9.94A.030(32)(a); RCW 9.94A.570. Unlike *Xaviar*, the State did not argue that

this was a more egregious case of rape of a child than other cases of rape of a child.

Instead, the State was merely expressing the obvious.

Importantly, the statement that "this is an extremely egregious case" needs to be

considered in the context of the prosecutor's entire statement. The entire statement was:

> And ultimately, your Honor, we would ask that you follow the
> recommendation. We believe that a trial based upon the input from the
> victims in this case would have been devastating. And so while this is an
> extremely egregious case, we believe that that recommendation is
> appropriate and recognizes the impact that may otherwise have occurred,
> even though each of these victims is incredibly strong and would have been
> able to be here.

RP at 320. The State was bolstering the parties' agreement by acknowledging that the

parties had already taken into account any circumstances that might have justified a

higher sentence in reaching the agreed recommendation. In context, the statement

actually disclaims any basis for imposing a higher sentence.

Next, Mr. Lowe assigns error to the prosecutor's statement, "[N]ot only was

[Victim A] engaged in this awful, awful ongoing cycle of physical and sexual abuse with

Mr. Lowe, but she also made it possible for him to victimize these two other girls." RP at

317. This statement was made in the context of mentioning that Mr. Lowe was able to

gain access to Victims B and C through Victim A.

14

This statement was the other part of the State's brief reminder to the court that there were three victims, not one. As previously discussed, the statement was brief and fairly innocuous. As to the State's comment that Victim A was "engaged in this awful, awful ongoing cycle of physical and sexual abuse," rape of a child is always awful and the crimes Mr. Lowe pleaded guilty to committing occurred over a five-year span. RP at 317. When viewed in context, the description of the crimes as "awful" and an "ongoing cycle" did not undermine the plea agreement.

The final statement Mr. Lowe challenges is, "Mr. Lowe is the type of individual that we cannot have in our community." RP at 318. In support of the appropriateness of the statement, the State relies on *Molnar*. In *Molnar*, the Supreme Court approved the use of such value-laden descriptors, but preferred the State not use the language of unrequested statutory aggravators. 198 Wn.2d at 518-19. Because this statement did not use any language from statutory aggravators, *Molnar* supports the State's argument. However, *Molnar* did not involve an agreed sentencing recommendation.

Acknowledging this aspect of *Molnar*'s holding, the State argues that *Molnar* is still applicable because the State's comment was an appropriate response to the letters of support from Mr. Lowe's friends and family. Br. of Resp't at 20. While these letters asked for "mercy" and "leniency," *id*., and sought to bolster Mr. Lowe's character, none

15

expressly advocated for a sentence other than what the parties had agreed to recommend.[2]

Had any of the letters expressly asked for a sentence below the standard range, mentioned

the statutorily-recognized mitigating factors in RCW 9.94A.535(1), or advocated for

leniency based on the purposes of the Sentencing Reform Act of 1981, chapter 9.94A

RCW, stated in RCW 9.94A.010, then perhaps, under *Molnar*, the State's comment

would have been an appropriate response to those letters.

Of the statements challenged by Mr. Lowe, the statement, "Mr. Lowe is the type

of individual that we cannot have in our community," RP at 318, is the only statement

that can be read as potentially undercutting the plea agreement. However, given the

totality of the circumstances, this single, questionable statement is insufficient to

constitute a breach of the plea agreement. Just because the parties reached an agreed

recommendation does not mean the sentencing court "[sh]ould be faced with a one-sided

hearing." *Talley*, 134 Wn.2d at 186.

When taking these statements into consideration, in addition to the single

questionable statement highlighted by Mr. Lowe, the facts before us are far less egregious

than those in *Xaviar*. Similar to *Xaviar*, the parties agreed to a low-end standard range

sentence. *Xaviar*, 117 Wn. App. at 198. However, unlike the record before us, during

---

[2] The only letter that appeared to advocate for a different sentence came from Mr. Lowe's father who asked that one "part" of the sentence include community service, while still acknowledging that his son still needed to serve time in prison: "I'm sure his time in prison will be pivotal in changing his behavior." CP at 199.

16

Mr. Xavier's sentencing, the State presented new facts and made seven statements that we viewed as undercutting the plea deal. Further, unlike *Xaviar*, here the prosecutor did not highlight the dismissed charges or the sentence it would have requested but for the plea agreement, did not comment on any lack of remorse, did not attempt to compare Mr. Lowe's case to any others it had prosecuted, nor did he inject any new facts that were not already before the court.

Importantly, when looking to the State's recommendation as a whole, it repeatedly urged the trial court to follow the recommendation:

- "[W]e came to the conclusion that it was appropriate for us to go forward and to recommend the bottom end of the range on Count I, which is the rape of a child in the second degree count, and we believe that that is very appropriate." RP at 318.
- "[T]hat is why we are recommending 210 months as well." RP at 319.
- "And ultimately, your Honor, we would ask that you follow the recommendation." RP at 320.
- "We believe that that recommendation is appropriate and recognizes the impact that may otherwise have occurred." RP at 320.

Moreover, the statements Mr. Lowe challenges were clearly made in the context of explaining the balancing process the State considered in reaching the plea deal:

> In resolving this case, the state heavily weighed the impact that a trial would have, not just on Victim A but also on Victim B and on Victim C. And ultimately, despite the gruesome nature of this case, as your Honor is fully aware from all of the documents that have been submitted, we came to the conclusion that it was appropriate for us to go forward and to recommend the bottom end of the range on Count I, which is the rape of a child in the second degree count, and we believe that that is very appropriate.

17

RP at 318. These facts also were not present in *Xaviar*.

The State did not evince an intent to undercut the plea agreement. Rather, it went into little detail about the underlying facts, that were already before the court via the probable cause affidavit attached to the presentence investigation, and repeatedly requested that the trial court follow the agreed-upon recommendation. The State's recommendation during Mr. Lowe's sentencing hearing was not violative of the plea agreement.

LFOs

Mr. Lowe contends that because he is indigent the trial court erred when it ordered the VPA, the DNA collection fee, and community custody supervision fees. The State concedes.

As explained in *State v. Ellis*, 27 Wn. App. 2d 1, 16-17, 530 P.3d 1048 (2023), Mr. Lowe is entitled to the benefit of recent changes in the law requiring that the $500 VPA, $100 DNA fee, and community supervision fees not be imposed on indigent defendants. Accordingly, we remand for the trial court to strike the VPA, the DNA collection fee, and the community custody supervision fees.

SAG

Mr. Lowe raises three additional issues in his SAG. None merit relief.

Mr. Lowe's first issue claims the judge was biased and had already made up his mind prior to the hearing. In support of his argument, Mr. Lowe cites the judge's statement:

> Before we adjourn, for those that presented, those that have been victimized and haven't presented, those that are members of the families and friends of those that have been victimized, you've been victimized as well. Thank you for your presentations today. Thank you for your impact statements. They made an impact. I had highlights throughout. She identified herself, [Victim A]'s and her counselors, things that I was going to read out loud, things that changed me reading. I didn't do that. Not sure why, but I didn't. Thank you. You guys have super powers.

RP at 340-41. Mr. Lowe emphasizes the judge's statement that he "had highlights throughout" to suggest the judge had already made up his mind. This statement does not logically support Mr. Lowe's inference. At most, it supports an inference that the judge came prepared to sentencing, having already reviewed the written materials submitted by both sides.

Mr. Lowe also highlights as evidence of bias the judge's statement about how this case impacted him more than other traumatic cases:

> And listening to [Victim A's] statement was extremely impactful on me. I can't ever be the same. I waved signs in the cold rain for this job, did first three murder trials, nothing. Those victims and the family's victims, the victims are gone. The families have continuing pain. In this particular case the victimization will never end. There are people that aren't even born yet that will be victims of your conduct. There are—the wide-spread devastation just can't be understated.

19

RP at 335-36.  Mr. Lowe fails to explain how this statement evinced improper bias.  The judge merely explained how he was personally impacted by listening to Victim A's statement during the sentencing hearing.  "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration."  *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

Next, Mr. Lowe contends he received ineffective assistance from his counsel.  Mr. Lowe claims his counsel was deficient by failing to mention several mitigating factors during sentencing.  This argument fails to merit consideration due to Mr. Lowe's failure to apply *Strickland*.[3]  *In re Matter of Rosier*, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986) (quoting *United States v. Phillips*, 433 F.2d 1364, 1366 (8th Cir. 1970) ("[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.")).  It also fails to merit review in part because it relies on facts outside the record.  On direct appeal, the evidence this court considers consists of "(1) a 'report of proceedings', (2) 'clerk's papers', (3) exhibits, and (4) a certified record of administrative adjudicative proceedings."  RAP 9.1(a).

Mr. Lowe also claims ineffective assistance of counsel due to only one of his two assigned lawyers appearing at the sentencing hearing and because counsel did not object to the judge's "breach of the plea agreement."  SAG at 5.  Again, Mr. Lowe fails to

---

[3] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

20

support his claim with citations to authority and argument based on that authority. Furthermore, the judge is not a party to the plea agreement and Mr. Lowe acknowledged his understanding that the court did not have to follow anyone's recommendation

Lastly, Mr. Lowe asserts that he had inadequate time to consider the plea agreement. This issue relies entirely on facts outside the record and therefore is not properly before this court. A personal restraint petition is the proper avenue for addressing arguments based on facts outside of the record. *State v. Estes*, 188 Wn.2d 450, 467, 395 P.3d 1045 (2017).

We affirm Mr. Lowe's sentence and remand to the trial court with directions to excise the VPA, the DNA collection fee, and the community custody supervision fees from the judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____    _____
Lawrence-Berrey, C.J.                         Staab, J.